The State of Maryland *vs.* George S. Brown, James Sloan, Jr., Lloyd Lowndes, Jr , Trustees, and others.

*Rights of Mortgagees—Mortgage of the Tolls and Revenues of a Canal—Rights of the Majority Bondholders—Trustees of Bondholders—Minority bondholder—Doctrine of Subrogation as Applied between two Classes of Bondholders, and as Against a Prior lien holder.*

By concurrent Acts, the States of Virginia and Maryland, and the United States, chartered the Chesapeake and Ohio Canal Company; and these States, and the United States, each subscribed to the capital stock of the company. Besides the original subscription to the stock, the State of Maryland subsequently advanced money and made loans to the company, for which it took liens, by way of mortgage, as security therefor, upon all the property, then existing and thereafter to be acquired, of the company, and of its tolls and revenues. The work of building the canal was prosecuted for a time, when, the company, having exhausted all of its available resources, further operations were suspended. In this emergency, the State of Maryland, being unable to furnish further pecuniary aid, and the company itself being without credit, the Legislature passed an Act authorizing the company to issue bonds and to execute a mortgage to secure the same, the State waiving its own liens upon the tolls and revenues of the canal in favor of said bonds. The mortgage provided that if the company should pay the interest on the bonds as the same fell due, and provide an adequate sinking fund for the redemption of said bonds, it should retain the management of the canal and its works, and collect and receive the revenues and tolls, but if it should fail to comply with these conditions "from any cause except a deficiency of revenue arising from a failure of business without fault on the part of said company," then the mortgagees might enter and take possession and appropriate the tolls and revenues in the manner provided in the mortgage. Held:

That the mortgagees were entitled to enter and take possession of and manage the canal, upon "the default of the company to per-

form its engagements in the premises," where such default arose from an inability on the part of the company to repair the canal, which had been greatly damaged by storms and freshets, and put it in a condition to earn revenue, and apply the same in due priority.

The State, to induce the bondholders to furnish the money necessary to complete the canal, having not only agreed to waive its own liens upon its revenues, but having agreed also that the company should pledge them by mortgage as security for the payment of the bonds, cannot, on failure of the company to operate the canal, and when the company is insolvent, and the work has continued for a considerable time past in no condition to earn revenue, insist upon the sale of the canal itself, and its franchises, clear of the liens of the bondholders on the ground that such liens extend to the revenues only, and not to the property of the canal, instead of allowing the bondholders to take possession of the canal, and to repair and operate it for the purpose of ascertaining whether it can be made to produce any revenue applicable to the payment of their debt.

The trustees of the bondholders being lawfully entitled to the possession of the canal, should be allowed to repair and restore it as a water-way so as to produce revenue.

If there be a difference of opinion among the bondholders as to the proceedings by which their interests will be best subserved, the will of the majority must govern.

So long as the trustees of the bondholders act in good faith, and for the purpose of carrying out the trust reposed in them under the mortgage, a minority bondholder has no right to interfere with them in the discharge of their duty.

To assist in the completion of the Chesapeake and Ohio Canal, the Act of 1844, ch. 281, was passed, by which the canal company was authorized to issue bonds to the amount of $1,700,000; and to facilitate the negotiation of these bonds, the State waived its liens upon the tolls and revenues of the canal in favor of said bonds, and with the consent of the company pledged the entire net tolls and revenues for the payment of the interest, and to provide a sinking fund for the redemption of the bonds at their maturity.   The Act further authorized the company to execute any mortgage necessary to give fullest effect to the provisions of the Act.   In pursuance of this Act a mortgage was executed on the 5th of June, 1848, and with the money arising from the sale

of these bonds the canal was completed to Cumberland. This mortgage provided that upon failure of the company to fulfil its engagements, according to the terms of the mortgage, the trustees or their successors should have power and authority to enter into possession, and execute the provisions of the Act, by collecting and applying the tolls and revenues of the work. The canal having been seriously injured by a freshet in 1877, it became necessary for the State in 1878, to extend further aid to the company, and this was done by a further waiver of the State's liens, and the giving authority to issue preferred bonds to the extent of $500,000. These bonds were issued under the Act of 1878, ch. 58, and were secured by a mortgage of the tolls and revenues, and also of all the property and franchises of the company. The Act of 1878, in its preamble, recited the provisions of the Act of 1844, ch. 281, and professed to be passed to carry into effect the reserved power of the company under said Act to use and apply such portion of the revenues and tolls of the company as might be necessary to put and keep the canal in good condition and repair. In 1889, another and more disastrous freshet happened, which occasioned a suspension of all business along the entire line of the canal. In this condition of affairs a bill in equity was filed by the trustees acting under the mortgage executed in pursuance of the Act of 1844, ch. 281; and shortly thereafter a bill was filed by the trustees to whom the mortgage, authorized by the Act of 1878, ch. 58, was executed. In both of these bills it was charged that the canal was in a broken and waste condition, and that the company was, and had been for a long time past, in default in paying overdue interest and meeting its obligations; that it was hopelessly insolvent, and that it had, to all intents and purposes, abandoned the canal, with no prospect whatever of being able to resume operation. The first bill prayed for the appointment of a receiver to take charge of the property and works of the company, and to repair and operate the canal, for the purpose of raising revenue with which to pay off the debts of the company; and for general relief. The second bill prayed that the mortgage of 1878 be foreclosed, and that a sale of all the property embraced in the mortgage, including the canal itself, and the franchises of the company be sold under a decree of the Court; and until such sale could be made, that a receiver be appointed to take charge of the property, and to repair and operate the work. The first bill was against the canal company and the trustees named in the mortgage of 1878; and the second bill was against the canal company and the trus-

tees acting under the mortgage made to secure the bonds issued under the Act of 1844. The canal company resisted the appointment of receivers under either bill; admitted its insolvency and insisted upon an immediate sale of the entire work. The State which was made a party defendant under the authority of a resolution of the Legislature answered, and opposed the appointment of receivers, and insisted, if it were possible, that an immediate sale should be effected. Certain of the holders of the bonds under the Act of 1844, as also under the Act of 1878, having obtained leave to be made parties, answered, resisting the appointment of receivers, and insisting upon an immediate sale. Receivers were appointed by the Court, and directed to make a full and thorough examination as to the condition of the canal, to estimate the probable cost of repairing and putting it in good condition, and whether it was feasible to operate it when repaired, and to report the same. The receivers made their report, and the Court decided that it was inexpedient to undertake to repair the canal through the agency of receivers, and that the complainants were entitled to a decree for a sale of the property and franchises of the canal free of all liens and incumbrances. Before a decree was signed, a petition was filed by the trustees of the bondholders under the Act of 1844, ch. 281, asking that they be allowed to redeem the bonds issued under the Act of 1878, ch. 58, and be subrogated to the rights and priorities of the holders thereof, and that they be put in possession of the canal, with the right and power to repair and operate the same. The trustees of the bondholders under the Act of 1878, ch. 58, answered, asserting their willingness to accept the principal and interest of the bonds, and that the petitioners should be subrogated to all the rights and priorities of the bondholders under the Act of 1878 and the mortgage executed thereunder. The State by its Attorney-General, resisted the granting of the petition. HELD :

That the trustees of the bondholders under the Act of 1844, ch. 281, acting under the mortgage of the 5th of June, 1848, made in pursuance of said Act, had such relation to the property and to the superior lien-holders, as entitled them to redeem the bonds issued under the Act of 1878, ch. 58, and upon the redemption of said bonds, to be subrogated to the rights and priorities of the holders thereof, and to be put in possession of the canal, with the right and power to repair and operate the same, under the jurisdiction and direction of the Court, and as they were authorized to do by the terms of the Act of 1844, ch. 281, and to apply

the tolls-and revenues of the work in the manner and order pre-
scribed by the decree.

APPEAL from the Circuit Court for Washington County,
in Equity.

On the 31st of December, 1889, George S. Brown,
Charles M. Mathews, John S. Gittings, Frederick M.
Colston, and Bradley S. Johnson, trustees of the holders
of the Preferred Construction Bonds of the Chesapeake
& Ohio Canal Company, issued under the Act of 1844,
ch. 281, filed their bill in the Court below against the
canal company, alleging the utter insolvency of the
company; its long-continued failure to pay the coupons
on their bonds; the maturity and non-payment of the
principal of the bonds; its entire loss of credit, and
consequent inability to borrow money for the most
urgent necessities of repair, and to preserve its exist-
ence; the entire destruction and total wreck of the
canal by the great storm of May, 1889, and the com-
plete suspension of business along its whole line; and
asking for the appointment of receivers to take pos-
session of and operate the canal, and to pay over the
net revenues to the plaintiffs, until their bonds and in-
terest were fully paid.    Subsequently, on the 16th of
January, 1890, the plaintiffs filed an amended bill, reit-
erating the averments of their original bill. but alleg-
ing in addition, the execution and delivery of the mort-
gage by the canal company, of the 15th of May, 1878,
in pursuance of chapter 58 of the Acts of 1878, to
George S. Brown, James Sloan, Jr., and Lloyd Lowndes,
Jr., trustees of the holders of the Repair Bonds author-
ized to be issued by that Act, and making said Brown,
Sloan and Lowndes as trustees, defendants.    On the
29th of January Messrs. Brown, Sloan, and Lowndes, as
trustees, filed their answer to the amended bill, insist-
ing upon the validity of said mortgage to them of the

15th of May, 1878, and its absolute priority as a paramount lien upon both the *corpus* of the canal and its tolls and revenues, distinctly denying the right of the plaintiffs to the appointment of receivers, and showing that upon a bill filed by said Brown, Sloan, and Lowndes, in the Supreme Court of the District of Columbia, against the canal company and the plaintiffs, as trustees for the bondholders of 1844, that Court, on the 28th of January, 1890, had appointed receivers. On the 31st of January, 1890, the Chesapeake and Ohio Canal Company filed its answer to the bill and amended bill, denying that the plaintiffs were entitled to the appointment of receivers, and stating its reasons for such denial; and in its answer it urged and insisted upon a sale of the entire work and all the property of the company. On the same day, Attorney-General White, in obedience to instructions from the General Assembly, applied to the Court for an order admitting the State of Maryland as a party defendant. An order was passed as prayed, and on the same day he filed an answer on behalf of the State, resisting the appointment of receivers, and thereby prayed and insisted upon a sale of the canal and all the property of the company. On the same day, upon petition, Bernard Carter, executor of Charles H. Carter, and trustee under his will, was also made a party defendant, as one of the bondholders. In the meantime, viz., on the 15th of January, 1890, the said George S. Brown, James Sloan, Jr., and Lloyd Lowndes, Jr., trustees under the mortgage of the 15th of May, 1878, from the canal company to them, as trustees of the holders of the Repair Bonds authorized to be issued and actually issued under the Act of 1878, ch. 58, filed their bill against the canal company and the trustees of the bondholders of 1844, claiming that their mortgage was the first and paramount lien upon the canal and its revenues, and alleging that a default had occurred such as, by the terms of the

Act of 1878, ch. 58, and of their mortgage thereunder, entitled them to a receiver and foreclosure, and accordingly praying for the appointment of receivers, and for a sale of the mortgaged property. The mortgage of the 15th of May, 1878, was filed as an exhibit. An application in writing to these trustees, signed by the holders of $330,500 of the $500,000 of Repair Bonds issued under the Act of 1878, ch. 58, and secured by the mortgage, was also filed as an exhibit to the bill, requesting the trustees to take proceedings for the foreclosure of the mortgage.

Answers were filed to this bill by the trustees of the bondholders of 1844, denying the validity and priority of the mortgage of the 15th of May, 1878, but uniting in the prayer for the appointment of receivers. The canal company answered, denying that a proper case was made for receivers, but submitting to the Court the prayer for a sale. Upon petition by the Attorney-General, the State of Maryland was admitted as a defendant in this case also, and filed its answer, resisting the appointment of receivers, and submitting to the Court the question as to a sale. And in like manner, upon petition, John A. Hambleton & Co. and Henry G. Davis & Co., minority holders of the Repair Bonds of 1878, were made parties defendants, and answered the bill, resisting the appointment of receivers, but praying for a sale of the canal. Bernard Carter, executor and trustee, and Anna M. Hughes and Thomas Hughes, trustees, were also made parties defendants. These two proceedings, seeking to some extent the same relief, were argued together, and by order of Court passed 3rd of March, 1890, were directed to be consolidated. The Court (ALVEY, C. J.) on the 22nd of February, 1890, filed an opinion, which will be found set out in full in the Appendix to this volume. In accordance with the views expressed in this opinion Chief Judge

ALVEY on the 3rd of March, 1890, passed a decree appointing Robert Bridges, Richard D. Johnson and Joseph D. Baker receivers, and they were directed to "proceed at the earliest moment at which the same can be properly and advantageously done, to make full and thorough examination, and collect all such information as they may be able to collect, as to the condition of the canal, the needful repairs thereof, and the probable cost of repairing it, and the feasibility of operating it when repaired, and shall report the same, with the results of their own observation and their own judgment and opinion in the premises, with the reasons therefor, to this Court, for its information, and such further action as it may deem necessary." The receivers duly qualified and proceeded to make out and submit to the Court a schedule of the property of the canal company, and also personally to inspect the canal, with a view to ascertain its physical condition, and the practicability of repairing and restoring it in such a way as to make it again a living and going concern. They submitted their first report on the 15th of May, 1890, accompanied by a schedule of the company's property and assets. On the 9th of June, 1890, they filed their second report, accompanying it with a copy of a decree of the Supreme Court of the District of Columbia, dated 1st of May, 1890, giving instructions to the receivers appointed by that Court, with a copy of the second report of those receivers. They filed with it also a statement of their own estimate of the annual cost of operating the canal; also the report to them of their engineers, Messrs. T. L. Patterson and T. P. Kinsley, showing the physical condition of the canal, and their estimated cost of repairing and restoring it. After the coming in of these reports and accompanying documents, nothing was done in the cause until the 9th of July, 1890, when the canal company filed a petition, alleging that in April, 1890, the

Board of Public Works had directed the President, Mr. Gambrill, to make a thorough inspection of the entire line of the canal, and report results; that such examination had been made, and a detailed statement of the result submitted to the stockholders at their annual meeting in June, in connection with the annual report of the president and directors. Copies of these reports were filed with the petition. Referring to these reports, the petition alleged : "These reports fully sustain and confirm the report of the receivers heretofore appointed by this Honorable Court, and filed on the 9th of June, 1890, that it is impracticable to repair and operate the canal with any expectation that it can earn in the future revenue enough to keep itself a living and going concern, and demonstrate that the interests of the creditors of your petitioner demand that further proceedings shall be had in the above entitled cases, looking to a disposition under the most favorable conditions of the canal and all its works, under the final decree of this Court. Your petitioner therefore, realizing that its continued existence as a revenue' earning concern is no longer possible, respectfully prays your Honors, in the interests of its creditors, to set these cases down for final hearing at an early day."

Upon this petition the case was set down for hearing on the 12th of August, 1890. On that day the solicitors for the trustees of the bondholders of 1844, filed the first, third and fourth reports of the District of Columbia receivers, the second report having been previously filed, together with exhibits of various kinds. On the same day, by leave of the Court, the Attorney-General was permitted to amend the answers originally filed by the State to the two bills in the consolidated cases, on the 31st of January, 1890, by inserting in each of such answers an additional paragraph, as follows: " The State now, by its Attorney-General, prays the Court to

pass a decree in this case for the sale of the canal and all
the franchises and property of the canal company, as
described in the three mortgages from the Chesapeake
and Ohio Canal Company to the State of Maryland, the
first bearing date on the 23rd day of April, 1835; the
second dated the 15th day of May, 1839, and the third
dated the 8th day of January, 1846." Copies of these
mortgages were filed. At the hearing a petition was
filed on behalf of the trustees of the bondholders under
the Act of 1844, alleging that the bonds under said Act
were generally held by capitalists, who were willing to
furnish the necessary money to repair the canal, upon
receivers' certificates, and operate it so as to repay the
money borrowed for repairs, pay operating expenses, and
yield a net revenue for the bondholders, and praying the
Court to appoint as receivers persons nominated or
selected by the trustees. The causes were argued, and
on the 1st of September, 1890, Chief Judge ALVEY filed
a second opinion, which will also be found in the Appen-
dix, wherein he concluded to pass a decree for the sale
of the entire work. But on the 18th of September,
1890, and before such decree was actually passed, the
trustees of the bondholders under the Act of 1844, ch.
281, filed a petition, the character of which is sufficiently
stated in the third opinion of Chief Judge ALVEY, to be
found, with the previous opinions, in the Appendix.
The trustees for the bondholders under the Act of 1878,
ch. 58, answered the petition, admitting the statements
of the petitioners and consenting to the passage of an
order as prayed. The State, by its Attorney-General,
answered the petition, denying the right of the trustees
to redeem the bonds of 1878, and to be subrogated to the
rights of the bondholders of 1878, under their mortgage;
denying the right of the petitioners to take possession
of the canal, and denying also the ability of the trus-
tees to restore the canal as a water-way, and operate

the same, so as to derive tolls and revenues sufficient to make the payments referred to in the petition. The matter was heard upon the petition and answers thereto, and on the 2nd of October, 1890, Chief Judge ALVEY filed his third opinion, to be found in the Appendix, accompanying it with the following decree:

These cases, heretofore consolidated, coming on to be heard, on final hearing were argued by counsel for the respective parties, and being submitted for decree, the bills, answers, and other proceedings were read and considered; and it appearing to the Court from the report of the receivers, filed on the 9th day of June, 1890, and from the other proceedings in the causes, that it is impracticable and inexpedient to direct that the said canal shall be attempted to be repaired and put in condition for transportation by the agency of receivers of this Court, and by the creation of an additional lien upon the *corpus* of the work for that purpose; and it further appearing to the Court that the said Chesapeake and Ohio Canal Company is largely in default, and is insolvent and wholly unable to earn any tolls and revenues, and to pay any part of the principal or interest due to its bonded creditors, and that a sale of the said Chesapeake and Ohio Canal and all its works, property and franchises is required for the payment of the Repair Bonds issued under the Act of 1878, chapter 58, and to the State of Maryland under the several mortgages held by said State, as shown in these proceedings; and that upon the pleadings and proof, the mortgagees and bondholders are entitled to a decree for such sale, subject to section 5 of the following decree:

*Section* 1. It is thereupon this second day of October, 1890, by the Circuit Court for Washington County, sitting as a Court of equity, in said two cases consolidated, adjudged, ordered and decreed, that all the rights, title and interest of the Chesapeake and Ohio Canal Com-

pany in and to its entire line of canal extending from
the City of Cumberland, in Alleghany County, to and
into the City of Georgetown, in the District of Colum-
bia, and all and singular the lands, tenements, and
estates, owned or acquired by the said Chesapeake and
Ohio Canal Company, for its construction or repair, its
works and appurtenances, and the site thereof, embrac-
ing the entire undertaking and every part thereof, and
all tools, implements and boats, built or purchased by
the said company for the use of said canal, and the
water rights and franchises of the said Chesapeake and
Ohio Canal Company, wheresoever the same or any part
thereof may be situated or held—be sold as hereinafter
prescribed.

*Section* 2. And it is further adjudged, ordered and de-
creed, that Joseph D. Baker, Robert Bridges and Rich-
ard D. Johnson, be and they are hereby appointed trus-
tees to make said sale, and that the course and manner
of their proceedings shall be as follows:

They shall first file with the Clerk of this Court a
bond to the State of Maryland, executed by themselves
and sureties, to be approved by this Court, or by the
Clerk thereof, in the penalty of one million of dollars,
conditioned for the faithful performance of the trust re-
posed in them by this decree, or to be reposed in them
by any future decree or order in the premises.

They shall then proceed to make the said sale, in front
of the Court House, in Hagerstown, having given at
least three months notice, by advertisement, inserted
in such daily newspaper or newspapers published in
the Cities of Baltimore, Washington, Richmond, Pitts-
burg and New York, as they shall think proper, of the
time, place, manner and terms of sale, which shall be
one-third cash, the balance in two equal instalments,
of one and two years respectively from the day of sale,
(or all cash, as the purchaser may elect,) and the credit

payments to bear interest from the day of sale, and to be secured by the note or notes of the purchaser or purchasers, indorsed to the satisfaction of the said trustees, and as soon as may be convenient after any such sale, the said trustees shall return to this Court a full and particular account of their proceedings, relative to such sale, with an affidavit annexed of the truth thereof, and of the fairness of said sale; and on obtaining the Court's ratification of the sale, and on the payment of the whole purchase money, (and not before,) the said trustees shall, by a good and sufficient deed, to be executed, acknowledged and recorded, according to law, convey to the purchaser or purchasers, his, her or their heirs, personal representatives and assigns, the property and estate to him, her or them sold, free, clear and discharged from all claim of the parties hereto, plaintiffs and defendants, and those claiming by, from or under them, or either of them. And the said trustees shall bring into this Court the money arising from said sale, and the bonds or notes that may be taken for the deferred payments, to be distributed under the direction of this Court, and as the rights of the parties may be made to appear, and then to be finally decreed, after deducting the costs of this suit, and such commission to the trustees as this Court shall think proper to allow, in consideration of the skill, attention and fidelity wherewith they shall appear to have discharged their trust.

*Section* 3. And it is further adjudged, ordered and decreed that out of the proceeds of the aforesaid sale, the expenses incurred by the receivers while in charge of the property (which may remain unpaid) shall be paid, the amount whereof to be ascertained by the auditor upon the production of the proper vouchers, and the said receivers shall be allowed by the auditor such sums as this Court shall determine to be fair and just as compensation to them for their services performed under the order of this Court.

State *vs.* Brown, *et al.*

*Section* 4. And it is further adjudged, ordered and decreed, that before said trustees above named shall proceed to the execution of this decree, by advertising the said canal property for sale, under this decree, the parties to these proceedings, or some of them interested therein, shall procure to be passed, by the Supreme Court of the District of Columbia, sitting in equity, on the proceedings now pending therein, a concurrent or ancillary decree, whereby the receivers heretofore appointed by that Court shall be discharged, and the canal, and all the property of the canal company, situate and being within the District of Columbia, shall become subject to this decree, and the sale hereby authorized to be made.

*Section* 5. And it is hereby further adjudged, ordered and decreed, upon the petition of the trustees for the bondholders under the Act of 1844, ch. 281, that the foregoing decree of sale shall be stayed and suspended, upon the compliance with and performance of certain requirements, terms and conditions, by the trustees under the mortgage of the 5th of June, 1848, or the survivors or survivor of them, or their successors in office, acting for and in behalf of the holders of the bonds issued under the Act of the General Assembly of 1844, ch. 281, that is to say:

First. That said trustees shall, within sixty days from the date of this decree, take up and bring into this Court, all the bonds issued, and now outstanding, under the Act of the General Assembly of 1878, ch. 58, or such portion of them as may be taken up, and the amount due upon the residue thereof, in legal tender currency, principal, with all interest thereon up to and inclusive of the day of bringing the money into Court, to be paid over to said bondholders under this decree, and shall also bring into this Court, within the time aforesaid, the further sum of ten thousand dollars with

which, or such portion thereof as may be required, to pay the expenses incurred by the receivers while in charge of the canal under previous order, and such compensation to said receivers as may be fixed by this Court.

And upon the bringing in of said money due on the bonds, as aforesaid, the said trustees so bringing in the money shall forthwith give ten days notice, in one or more daily newspapers, published in the City of Baltimore, of the fact that the money is on deposit in Court to be paid over to the parties entitled thereto, upon presentation and surrender of the bonds held by them.

Second. That upon bringing in the bonds, or the bonds and money as aforesaid, within the time aforesaid, and the giving the bond hereinafter prescribed, and the procuring of a concurrent or ancillary decree from the Supreme Court of the District of Columbia, sitting in equity, on the proceedings now pending in said Court, or procuring the said proceedings to be dismissed, so that this decree may be operative over the entire canal, and all the works and property and franchises of the Canal Company, the said trustees under the mortgage of the 5th of June, 1848, acting for the holders of the bonds issued under the Act of 1844, ch. 281, shall be subrogated to and stand in the place of the trustees for the holders of the said bonds issued under the Act of 1878, ch. 58, with all the rights and remedies belonging or pertaining to said trustees, under the said Act and the mortgage executed in pursuance of the said last mentioned Act ; and to all the rights and remedies of the holders of the bonds issued under the said Act, to the same full extent as if the said bonds were duly assigned to the said trustees, acting under the mortgage of the 5th of June, 1848 ; and thereupon the receivers appointed by this Court shall surrender to the said trustees, acting under the mortgage of the 5th of June, 1848, possession of the said canal, and all the property

of the canal company of which they are now in charge ; and the said trustees shall become entitled to the full possession and control of the entire canal from the City of Cumberland to its terminus in Georgetown, in the District of Columbia, together with all the rights and property of the canal company, with power and authority to use and exercise the franchises of said company, in its proper corporate name, to the same·extent and to like purposes, and none other, that said company could or might do, acting by authority of and under the control of a board of directors as provided by its charter.

Third. That the said trustees, acting under the said mortgage of the 5th of June, 1848, shall by the first day of May next, 1891, at their own cost and expense, to be reimbursed to them as hereinafter directed, have put in good repair and condition the entire canal from one terminus thereof to the other, so that it be fit for and capable of safe transportation thereon, and that upon so restoring said canal to a state of good repair and condition, the said trustees shall proceed to operate the same as a public water-way, with all the rights, and subject to all the conditions and limitations, granted and prescribed by the charter of the said company ; and the said trustees shall keep said canal in good repair and condition, and continue to operate the same, save and except when such operation may be suspended by the action of causes against the effect of which prudence and due care in management will not provide.

And the tolls and revenues received or derived from the use and operation of said canal as a public water-way, and from the property and rights of the canal company, shall be applied by the said trustees as follows :

First, to pay all current and ordinary expenses incurred in operating the said canal, and for keeping the same in good working repair;

Second, to pay and reimburse the said trustees the amount of money brought in by them with which to pay the expenses incurred by the receivers, and their compensation, with interest thereon;

Third, to pay and reimburse to said trustees the amount expended by them in restoring the said canal to good working order from its present waste and broken condition, with interest thereon;

Fourth, to pay and reimburse said trustees any amount that they may be required to pay, as constituting a superior lien on the tolls and revenues of said canal company to that of the bonds issued under said Act of 1844, ch. 281, for labor and supplies furnished to the said canal company while said canal was operated and controlled by said company, with interest on the amount so paid;

Fifth, to pay the interest that has accrued and may accrue due on the bonds issued under the Act of 1878, ch. 58, and then the principal of said bonds,

And Sixth, to pay the interest that has accrued, and that may accrue due on the bonds issued under the Act of 1844, ch. 281, and then the principal of said bonds. And upon the full payment of these last mentioned bonds, the possession and control of said trustees shall cease and terminate.

Fourth. That the said trustees shall open an office in Hagerstown, to be known as the canal office, where all books, maps and papers relating to said canal and the affairs thereof, shall be kept and preserved, and which said office shall be open and accessible to all persons having dealings and transactions with the said trustees, their agents and managers; and the said trustees shall keep, or cause to be kept, regular and proper books of account, showing fully and accurately all receipts and expenditures and disbursements, and shall, at the end of each boating or transportation season,

State *vs.* Brown, *et al.*

make full and accurate reports to the Court, under oath, of all receipts and expenditures, and of the real condition of the canal, and the amount of tonnage thereon, during the preceding year.

And said office and all books and accounts therein shall be open and accessible to the auditor of this Court, whenever he may be required to examine and state accounts of and concerning the affairs of said trustees, and their accountability under this decree.

Fifth. That the said trustees shall, within sixty days from the date of this decree, make and execute a bond to the State of Maryland, in the penal sum of six hundred thousand dollars, ($600,000,) conditioned that the said trustees will well and faithfully do and perform the several things required of them to be done, and comply with all the terms and conditions in this fifth section of this decree prescribed; which bond shall be with good and sufficient sureties, to be approved by this Court, and shall be filed among the proceedings in this cause, as security for the due performance of the duties and obligations assumed by the said trustees under this decree.

And if the said trustees shall fail or neglect to take up and bring in the bonds, or the money due thereon, and also the money to pay receivers' expenses and compensation, within the time and as required by the first clause of the fifth section of this decree, and to give the bond as hereby required, the several clauses and conditions contained in this fifth section of this decree shall have no effect or operation whatever, and shall in no way operate to suspend or delay the execution of the decree for sale.

Sixth: That if at the end of four years from the first day of May next, there shall not have been tolls and revenues derived from the said canal, and the property and rights appurtenant thereto, (over and above the

State *vs*. Brown, *et al.*

amount necessary to pay current operative expenses, and to keep the canal in repair,) to liquidate and discharge the amount of the cost of repairing and restoring the canal to a working condition from its present broken condition, and the amount of money required to pay expenses and compensation to the receivers, and to pay any amount that may be determined to be a preferred lien on such tolls and revenues for labor and supplies furnished to the canal company, such failure in the tolls and revenues shall be regarded as evidence conclusive, (unless the time be extended by the Court for good and sufficient cause shown) that the said canal cannot be operated so as to produce revenue with which to pay the bonded indebtedness of the said canal company; and further, whenever it shall clearly appear that the said canal cannot be operated by the said trustees so as to produce revenue with which to pay the bonded indebtedness of said company, the right and power is hereby reserved to this Court to order and direct the execution of the foregoing decree of sale.

*Section* 6. That in the event of sale of the said canal, the costs of these proceedings, to be taxed by the clerk, shall be paid out of the proceeds of sale; but if the said canal shall pass into the possession of the trustees under the mortgage of the 5th of June, 1848, by virtue of the fifth section of the foregoing decree, the costs shall then be paid by the complainants in this cause.

From the foregoing decree the present appeal was taken.

The cause was argued before MILLER, ROBINSON, IRVING, BRYAN, FOWLER, MCSHERRY, and BRISCOE, J.

*William Pinkney Whyte, Attorney-General,* for the appellant.

*Bradley T. Johnson, John K. Cowen,* and *S. Teackle Wallis,* for the appellees.

ROBINSON, J., delivered the opinion of the Court.

Before proceeding to consider the several questions, which have been argued with so much ability in this case, it is necessary to refer briefly to certain facts connected with the history of the Chesapeake and Ohio Canal Company, out of which this litigation has arisen, and to refer also to the successive steps which have been taken in the progress of the suit, from the filing of the original bill down to the final decree, from which this appeal was taken.

This company was chartered as far back as 1824, for the purpose of uniting the waters of the Ohio River with the waters of the Chesapeake Bay. It does not appear that any effort was made to build the canal west of Cumberland; but its construction from that point to Georgetown, in the District of Columbia, was deemed of great public importance, especially as affording an outlet for the large and valuable coal fields of Alleghany County. Its estimated cost was about eight millions of dollars, and of this amount the State of Maryland, by loans, and subscriptions to the capital stock, furnished the large sum of seven millions. The work was prosecuted from time to time till the latter part of 1841, when, having exhausted all its available resources, further operations were suspended. The State was unwilling, and was, in fact, it may be said, unable at that time, to furnish any further pecuniary aid; and the company itself being without credit, all efforts to raise money for the competition of the canal were unsuccessful. Its completion to Cumberland, however, was a matter of vital importance, for upon shipment of coal from that point, the tolls and revenues of the canal mainly depended; so it was in this emergency that the Act of

1844 was passed, by which the company was authorized to issue bonds to the amount of one million and seven hundred thousand dollars, and in order that these bonds might be negotiated on the best possible terms, the State waived its own liens upon the tolls and revenues of the canal in favor of said bonds, and with the consent of the company pledged the entire net tolls and revenues, for the payment of the interest, and to provide a sinking fund for the redemption of the bonds at their maturity. And the Act further authorized the company to execute "any deed or mortgage necessary to give the fullest effect to the provisions of the Act." It was in pursuance of this Act that the mortgage of 1848 was executed; and with the money arising from the sale of these bonds the canal was finally finished to Cumberland. Now it can hardly be necessary to say that in this, as in many other like public improvements, the hopes and expectations of its promoters have never been realized. With the exception of a brief interval, the revenues of the canal, during the forty years of its operation, have barely been sufficient to meet its current expenses, and the State to-day has never received a dollar, either on its loans, or subscriptions to the capital stock. The bondholders under the Act of 1844 have shared pretty much the same fate, and the company is now indebted to them, interest and principal, exceeding four millions of dollars. While thus burdened with debt, the freshet of 1877 occurred, in consequence of which the canal was badly damaged, and, in order to repair it, the company was obliged to apply to the Legislature for authority to issue bonds to the amount of $500,000, and to mortgage the entire property and revenues of the canal, to secure the payment of the interest and principal of these bonds; and these bonds, known as "*the Repair Bonds*," are the first and paramount lien upon the revenues at least of the canal. And then

again, in the spring of 1889, another and more disastrous freshet happened, and the company, without money and without credit,—in fact, hopelessly insolvent,—has never been able to repair and restore the canal as a water-way, in consequence of which from that time to the present all business along its entire line has been suspended.

Now, in this state of things, the bill of the trustees of the bondholders of 1844 was filed. The bill alleges the insolvency of the company, its long and continued default in the payment of interest and principal of the bonds now overdue,—its inability to repair the canal, and the entire suspension of business along its whole line ; and prays for the appointment of receivers to take possession of, and to repair and operate the canal, and to pay over its net revenues to the complainants, until the interest and principal of their bonds were fully paid.

A few days afterwards a bill was also filed by the trustees of the holders of the Repair bonds of 1878, claiming that their mortgage was the first lien upon the property and revenues of the canal, and alleging that a default had occurred on the part of the company, such as, by the terms of the Act and of their mortgage executed thereunder, entitled them to the appointment of a receiver and foreclosure, and praying for the appointment of receivers and for a sale of the canal. On the petitions of the Attorney-General and Bernard Carter, trustee and executor, the State and Mr. Carter were made parties defendants. To these bills answers were filed by the State, and by the company, each denying that a case had been made out for the appointment of receivers, and both submitting the question as to a sale of the canal to the determination of the Court.

Upon the case as thus presented, the learned Judge below decided that the bondholders, under the Act of 1844 were entitled to the appointment of receivers to

take possession of the canal; and, secondly, that, if there could be any question as to their right in this behalf, there could be none as to the right of the holders of the Repair bonds of 1878, which were the first liens upon the revenues of the canal. Receivers were thereupon appointed, and directed to make a full and thorough examination as to the condition of the canal, to estimate the probable cost of repairing and putting it in good condition, and whether it was feasible to operate it when repaired, and to report the same, together with the reasons on which their judgment was founded, for such further action in the premises as the Court might deem proper. After an examination in pursuance of this decree, the receivers were of opinion that it was inexpedient to undertake to *repair the canal by issuing receivers' certificates*, and further, that, if repaired and put in proper condition, there was no reasonable prospect of its being able to earn revenue applicable to the payment of the bonds of 1844.

After the report of the receivers was put on record, an amended answer, in the nature of a cross-bill was filed by the State, praying for a sale of the entire property of the canal, under the mortgages held by the State. Upon the case as thus presented, the Court, after full hearing, decided that it was inexpedient to undertake to repair the canal through the agency of receivers, and that the complainants were entitled to a decree for the sale of the property and franchises of the canal, free and clear of all liens and incumbrances. The Court further decided that the lien of the bondholders of 1844 extended *only to the revenues and tolls*, and that in the event of a sale, they stood in the relation of simple unsecured creditors, merely as to the proceeds of sale.

Before a decree was signed in conformity with the opinion of the Court, a petition was filed by the trustees under the mortgage of 1848, claiming the right to

redeem the Repair bonds of 1878, and the mortgage executed to secure the payment of the same, and which constituted the first lien on the revenues of the canal; and upon the payment of interest and principal to be subrogated to all the rights and remedies of the holders of said bonds. In answer to this petition, the trustees of the bondholders of 1878 aver their willingness to accept the interest and principal of the bonds held by them, and to transfer the same to the petitioners, so that they may be subrogated to all the rights to which the holders of the bonds are entitled under the Act of 1878.

Upon the filing of this petition a final decree was passed, by which the Court decreed that the entire property and franchises of the canal should be sold at public auction, but at the same time directed a suspension of the sale upon the following, among other, conditions set forth in the decree:

1st. That the trustees of the bondholders under the Act of 1844, shall within sixty days bring into Court the Repair bonds of 1878, or pay into Court an amount equal to the interest and principal of said bonds.

2nd. Upon a compliance with this condition, the trustees shall be subrogated to all the rights and remedies of the holders of the Repair bonds of 1878, and shall be entitled to the possession of the canal, with full power to operate the same.

3rd. That the trustees shall by the first of May, 1891, at their own expense, to be reimbursed out of the net revenues of the company, put the canal in good repair and condition.

And after prescribing the manner in which the revenues shall be applied, the decree further provides, that if, at the end of four years, the revenues shall be insufficient to pay the operating expenses, and the cost of restoring it as a water-way, and such liens as may be adjudged preferred liens for labor, then such failure of

tolls and revenues shall be conclusive evidence that the
canal cannot be operated, so as to produce revenue
with which to pay its funded indebtedness. It is from
this decree that this appeal has been taken. Now, it
will be observed, that, although the Court had decided
that the lien of the bondholders of 1844 was upon the
tolls and revenues, and not upon the *corpus* of the canal,
yet this question is by *the decree reserved for final deter-
mination,* when the proceeds of sale shall have been
brought into Court for distribution. So the real question
after all, is whether the Court was right in suspending
the sale; and in decreeing that the trustees of the bond-
holders of 1844 were, upon compliance by them with
the terms and conditions of the decree, entitled to the
possession of the canal, with authority to repair and
operate it, with the view of ascertaining whether under
their management, it could be made to produce any reve-
nue applicable to the payment of its bonded indebted-
ness. And this depends, first, upon the rights of the
trustees under the Act of 1844, and the mortgage of
1848 executed in pursuance thereof; and secondly, upon
their rights as purchasers of the Repair bonds of 1878.
We have already referred to the circumstances under
which the Act of 1844 was passed—to the fact that the
canal was finished with the money arising from the sale
of the bonds issued under it, and to the further fact,
that the value of the large amount of stock held by the
State, and the security of its loans by way of mortgage,
absolutely depended upon the canal's being finished to
Cumberland. And to induce persons to invest their
money in these bonds, the State by this Act waived its
own liens, and declared that these bonds should be *pre-
ferred liens* on the tolls and revenues of the canal. It
was to carry out the provisions of this Act that the
mortgage of 1848 was executed, by which the company
mortgaged its entire revenues to secure the payment of

the interest, and to provide a sinking fund to pay the principal upon the maturity of the bonds, with power and authority on the part of the grantees, to *enter and take possession of the canal and receive its revenues "upon the default of the company to fulfil its engagements in the premises."*

The right to enter is however subject to the following condition: "That so long as the Canal Company shall comply with its agreement by paying all the interest upon said bonds as the same falls due, and by providing an adequate sinking fund for the redemption of said bonds, it shall retain the management of the canal and its works, and collect and receive the revenues and tolls, but if they fail to comply with these conditions from any cause except a deficiency of revenue arising from a failure of business, without fault on the part of said company, then the grantees may demand, and shall thereupon receive possession, and shall appropriate all said tolls and revenues in the manner herein before provided."

But for this covenant for possession on the part of the mortgagor, the right of the trustees to enter and take possession of the canal upon "the default of the company to perform its engagements in the premises" could not be questioned. Not only is this right conferred by the terms of the mortgage, but independent altogether of an express grant, it is a right to which they would be entitled by operation of law. So the inquiry comes to this: In what manner and to what extent is this right qualified by the covenant? The appellant contends, that it is to be construed as an agreement between the parties, that if there shall be a deficiency of revenue, *from any cause whatever, without "the fault of the company,"* using the term "fault" in the sense of *bad faith,* or *mismanagement,* the company shall still be entitled to its control and management. And if the canal has been damaged by storms and freshets, disasters which its of-

ficers could not foresee or avert, and the company is unable to repair and restore it as a water-way, in consequence of which it is not in a condition to earn revenue, its failure to earn revenue under such circumstances cannot be considered the fault of the company within the meaning of the covenant. On the other hand, it is insisted that the term "fault" as here used is to be understood in its broader sense, as meaning not only mismanagement, but also any *legal default* on the part of the company, in view of its obligations to the public to operate it as a public work. Strictly speaking, the term "fault" may in itself be susceptible of either construction. But when it is considered in the light of the circumstances under which the mortgage was executed, there cannot be, it seems to us, any difficulty as to the real meaning of the parties. Although the company was chartered as a private corporation, the canal itself was in a certain sense a public work, in the construction and operation of which the public had an immediate interest. And, while the State was willing to waive its own liens, and, with the assent of the company, to pledge its entire tolls and revenues for the payment of the bonds to be issued under the Act of 1844, yet if, from failure of business without the fault of the company, the revenues should be insufficient for this purpose, the State—the owner of the greater part of the capital stock,—was unwilling to surrender the control and management of the canal to the mortgagees or to other parties. No one supposed for a moment, that the canal, under any circumstances, would not yield revenue sufficient to pay its operating expenses and to keep it in proper repair. The Act of 1844, in fact, provided that no bonds should be issued for the completion of the canal, until one or more coal companies or individuals had guaranteed the transportation of not less than *one hundred and ninety-five thousand tons of coal a year for five years;* and the mort-

gage recites that this guarantee had been given in terms satisfactory to the State.    The tolls from the transportation of this coal were deemed, no doubt, sufficient at least to pay the interest, and to provide a sinking fund, for the redemption of the bonds at maturity.    But if this guarantee should fail, if from failure of business, without fault of the company, the revenues should be insufficient for this purpose, it was still to retain the control of the canal.    The parties, however, were dealing with the revenues of a canal in a condition to earn revenue by the transportation of coal and other produce.    It was a failure of business in the sense of a depression in or want of business, and not, as the Court below says, an *incapacity to do business by reason of the inability on the part of the company to repair it and put it in a condition to earn revenue.*    And when it was agreed that the mortgagor should retain possession of the canal even though its revenues might be insufficient to enable the company "to perform its engagements in the premises," the parties meant "revenues" which the canal was able to earn as a waterway, according to the objects and purposes of its incorporation.    By no fair rule of construction, can the "failure of revenue," as used in this covenant for possession, be construed as a failure arising from *an inability* on the part of the company to repair it and put it in a condition to earn revenue.    A state of things exists never contemplated by the parties.    The canal, in its present condition, is useless as a water-way; the company is insolvent, and without means to restore it; and under such circumstances the right of the trustees of 1848 to enter and take possession is in no manner restricted or qualified by the covenant relied on by the appellant.

But if there could be any doubt as to this right under the mortgage of 1848, no one, it seems to us, can question their right in this respect as purchasers of the Repair bonds of 1878, and which, according to the decision in

*Commonwealth of Virginia vs. Ches. & Ohio Canal Co., et al.*, 32 *Md.*, 501, constitute the first lien upon the revenues at least of the company. The mortgage to secure the payment of these bonds provides, it is true, that upon the default of the company in the payment of three successive coupons, the trustees may, at the request in writing of a majority of the holders of the bonds, institute proceedings of foreclosure and for the appointment of receivers.

And it further provides, that until such default, no proceedings of any kind, either at law or in equity, shall be instituted, it being the intent, says the mortgage, that until such default, the company shall retain the control and management of the canal. But if a default has occurred according to the terms of the mortgage, these covenants cannot be construed as operating to deprive the mortgagees of any remedy to which they are by law entitled. By such default they have the right *to foreclose, to ask for the appointment of receivers,* and to enter and take possession of the mortgaged property. These are remedies to which the mortgagee, in the absence of covenants to the contrary, is entitled upon the default of the mortgagor. *Burnell vs. Martin,* 2 *Doug.,* 419; *Schoole vs. Sall,* 1 *Sch. & Lef.,* 176; *Garforth vs. Bradley,* 2 *Ves., Sr.,* 678.

If, then, the trustees for the holders of the Repair bonds of 1878 would be entitled to enter and take possession upon the default of the company to pay the coupons, and according to the terms of the mortgage, the trustees of the bondholders of 1844, as purchasers of the Repair bonds, are by the well settled principles of subrogation or substitution entitled to the same remedy. 2 *Story's Equity Juris.,* 1023; 4 *Kent's Com.,* 162; *Denman vs. Nelson,* 31 *N. J. Eq.,* 452.

So in any aspect in which the right of these trustees may be considered, whether under the Act of 1844 and

the mortgage of 1878 executed thereunder; or as purchasers of the Repair bonds of 1878, we are of opinion that by the default of this company to pay its indebtedness according to the terms of these mortgages, they are entitled to take possession of the canal upon the terms prescribed by the decree.

But then it is said whatever may be the rights of the trustees as against the company, the State has the right, under its mortgages, to insist upon the sale of the entire property and franchises of the canal.   Now upon what grounds can this right be supported ?   To induce the bondholders of 1844 to furnish the money necessary to . complete the canal, the State not only agreed to waive its own liens upon its revenues, but agreed also that the company should pledge them by mortgage as security for the payment of these bonds.   And now, when the State and the company have operated the canal till they are no longer able to operate it, and when the canal itself is no longer in a condition to earn revenue, and the company during all these forty years has been in default in the payment of its indebtedness according to the terms of the mortgage, and when the bondholders ask to be allowed to take possession of the canal, and to repair and operate it for the purpose of ascertaining whether it can be made to produce any revenue applicable to the payment of the mortgage, the State interposes and insists that it shall be sold *clear of the liens of these bondholders which the State agreed should be preferred liens* upon its revenues, and when it is sold the State further claims as against them, the entire proceeds of sale because their liens, it is said, extend to the revenues only, and not to the property of the canal.   In other words, the State insists that they shall be deprived of the only remedy open to them by which they may have the opportunity, at least, of reimbursing themselves for the money which they, at the instance of the State, furnished to finish the

33                    v. 73.

canal.    So it is not the case even *of a junior incumbrancer* asking for the sale of mortgaged property, and the proceeds of sale to be applied to the payment *of the several liens upon it according to their priority;* but it is one in which the State, holding liens upon the revenues and property of an unfinished canal, in order to induce others to furnish the money necessary to finish it, waives its own lien upon the revenues in favor of such persons, and then insists that the canal shall be sold, whereby these liens are destroyed.    We do not see on what ground, legal or equitable, such a contention as this can be supported.

But then again it is said these trustees ought not to be permitted to burden the company with any additional indebtedness by undertaking to repair the canal, because the record shows that if repaired it cannot be made to produce any net revenue.    Now, what is the proof upon this point?    There is, it is true, the report of the receivers appointed by the Court below; but then against this, is the report of the receivers appointed by the Supreme Court of the District of Columbia, in which they come to a different conclusion.    So, after all, it is a question in regard to which fair, impartial and competent persons may honestly differ.    There is, too, the report of the company, which shows for the past twelve years, at least, that the revenues have not been sufficient to pay the operating expenses. But then it does not necessarily follow that better results may not be expected from the management of others more directly interested in developing the earning capacity of the canal to its utmost extent.    If it should fail, after a fair trial, to yield any revenue applicable to the payment of the bonds of 1844, the decree below directs it shall be sold at public auction.    The fact that it has in the meantime been repaired and put in good order along its entire line ought, it seems, to enhance its

marketable value, whether sold as a water-way, or to be used, as was argued, for the construction of a railroad. If so, and the State, according to its contention, be entitled to the proceeds of sale, its interests could not be injuriously affected by having it repaired and restored as a water-way. But be this as it may, if the trustees are lawfully entitled to its possession, they ought to be allowed to put it in a condition to produce revenue, otherwise its possession would be without benefit to them.    And while a Court of equity will not permit a mortgagee to burden the estate by the expenditure of money for unnecessary and useless repairs, it will authorize him to. make such repairs as may be necessary for the preservation and beneficial occupation of the property.    *Sandon vs. Hooper*, 6 *Beavan*, 246; *Neesom vs. Clarkson*, 4 *Hare*, 97; *Boston Iron Co. vs. King*, 2 *Cush.*, 400; 2 *Jones on Mortgages*, secs. 1126–1131.

We have not deemed it necessary to consider whether, in the event of a sale, the lien of the bondholders of 1844 will attach to and follow the proceeds of sale, or whether they are limited to the tolls and revenues.    The Court below was of opinion they had a lien upon the revenues only, but this question was by the decree from which this appeal was taken, reserved for final determination, when the proceeds of sale are brought into Court for distribution.    This much, however, we may say, it is a question which the parties are entitled as matter of right to have decided before a sale is made.    If the bondholders have no lien upon the proceeds of sale, they have practically no interest in the sale; whereas if they have a lien, it will be to their interest to see that the canal brings its fair value.    For the same reasons the State is equally interested in having the rights of the respective parties determined.

As to the appeal of Mr. Carter, trustee, and executor, it is sufficient to say, if there is any difference of opinion

among the bondholders whether their interests will be best subserved by these proceedings, the will of the majority must in this, as in other like cases, govern. The suit was brought by the trustees at the request of a majority of the bondholders, and so long as they *act in good faith, and for the purpose of carrying out the trust reposed in them under the mortgage, a minority bondholder has no right to interfere with them in the discharge of their duty. Shaw vs. Railroad Compony,* 100 *U. S.,* 605. A good deal was said about the veil which conceals the *real motives* that have prompted this litigation. Whatever they may be, we must deal with the case, as it is presented by the record, and so dealing with it, we are of the opinion that the decree below must be affirmed.

*Decree affirmed.*

(Decided 20th February, 1891.)