### TRUITT, et ux v. BOARD OF PUBLIC WORKS OF MARYLAND, et al.

[No. 56, September Term, 1966 (Adv.).]

376

378

Decided June 24, 1966.

Concurring opinion filed July 22, 1966.

The cause was argued before PRESCOTT, C. J., and HAM-MOND, HORNEY, MARBURY, OPPENHEIMER, BARNES and Mc-WILLIAMS, JJ.

*Victor H. Laws* for appellants.

*Alan M. Wilner, Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for Board of Public Works, Comptroller of the Treasury, State Treasurer and Maryland Hospital Commission, part of appellees; *Francis D. Murnaghan, Jr.* with whom was *Paul S. Sarbanes,* on the brief, for Greater Baltimore Medical Center, Inc., one of appellees; *Alexander Harvey, II* for Church Home & Hospital of the City of Baltimore and *Francis X. Gallagher,* with whom were *John C. Evelius, Joseph G. Finnerty, Jr.* and *Alfred L. Scalan,* on the brief, for The Sisters of the Third Order of St. Francis, Philadelphia Foundation of St. Joseph Hospital, Baltimore, Md., other appellees.

OPPENHEIMER, J., delivered the majority opinion of the Court. BARNES, J., concurs in the result. Concurring opinion at p. 411, *infra.*

This appeal from a decree in a declaratory judgment proceeding in the Circuit Court of Baltimore City involves the constitutionality and validity of the Hospital Construction Loan Act of 1964. The appellants, the plaintiffs below, are owners of

Maryland real estate and residents and taxpayers of Maryland. The appellees, defendants, are Greater Baltimore Medical Center, Inc. (Greater Baltimore), Church Home and Hospital of the City of Baltimore (Church Home), Sisters of the Third Order of St. Francis, Philadelphia Foundation, of St. Joseph's Hospital, Baltimore, Maryland (St. Joseph's), (hereafter collectively referred to as the hospitals) ; and the Board of Public Works (the Board), the Comptroller and the Treasurer of the State of Maryland and Maryland Hospital Commission (the Commission), (hereafter collectively referred to as the State).[1]

The Hospital Construction Loan Act of 1964 (Ch. 138, Laws of 1964, as amended Ch. 792, Laws of 1965) (the Act) authorizes the creation of a State debt of $50,000,000 for the purpose of assisting in the financing of construction, expansion, relocation, replacement and modernization of the facilities and equipment of voluntary, nonprofit hospitals. The Act also creates the Commission which receives applications for State loans from hospitals, ascertains whether the hospital is eligible under the Act and whether the requested loan is in accordance with the purpose of the Act, and makes recommendations thereon to the Board.[2] The rate of interest of the loans is to be the rate of interest borne by the issue of general credit obligations of the State last sold prior to the grant of loan funds plus an ad-

1. The suit also named as defendants Presbyterian Eye, Ear and Throat Charity Hospital and Hospital for the Women of Maryland, Inc., the predecessors of Greater Baltimore, but neither had applied for any State loans under the Act and appellants offered no evidence that either had any interest in the proceedings. The trial court sustained demurrers filed by Presbyterian and Women's Hospital, and the appellants concede the correctness of that action.

2. The provisions of the Act in respect of the creation of the Commission, its powers and duties, the conditions of and limitations of loans and other matters now constitute Code (1965 Repl. Vol.), Art. 43, Secs. 568A-568G inclusive. Unless otherwise stated, the references to the Act are to the Code provisions. Section 2 of the Act authorizes the Board to issue certificates of indebtedness of the State in the amount of $50,000,000. Section 5 provides that the actual cash proceeds of the sale of the certificates shall be used exclusively for loans to be made to voluntary nonprofit hospitals on the terms provided in the Act. These Sections of the Act with reference to the creation of the $50,000,000 indebtedness and the use of the proceeds thereof are not contained in the Code.

ditional rate of interest equal to one-eighth of one per cent per annum. The term of any loan may be up to 40 years.

The Commission received a number of applications from various hospitals throughout the State. Of these applications, one was from Greater Baltimore for a loan of $7,000,000; one was (as amended) from Church Home for a loan of $462,000; and one was from St. Joseph's for a loan of $7,500,000. After investigation the Commission approved these three applications, subject to certain reservations, and recommended them to the Board. On September 17, 1965, the Board approved a loan of $25,000 to each of the three hospitals.

Subsequent to the decision of the lower court in this case, the General Assembly amended the Act by providing that the Hospital Construction Loan of 1964 shall consist of two separate and distinct loan funds; each in the amount of $25,000,000: one to be used for loans to hospitals not affiliated with a church or religious denomination, and the other to be used for hospitals so affiliated (the 1966 amendment). In the event this Court declares the Act constitutional, the 1966 amendment will be automatically repealed 30 days thereafter (Ch. 714, Laws of 1966).

At the hearing below, testimony was taken and a number of exhibits and stipulations were filed. In a comprehensive opinion, Judge Harris held the Act constitutional and valid in all respects.

The appellants contend here, as they contended below, that they have standing to sue; that the Act results in an establishment of religion forbidden by the Maryland and Federal Constitutions and prohibits the free exercise by the appellants of their religion in violation of the First Amendment and requires the appellants to contribute to a place of worship and a ministry in violation of the Declaration of Rights; that the loans to the hospitals are invalid because the State Treasurer, who is a member *ex officio* of the Board, approved the hospital loans attacked in this case, although he was also a member of the Board of Trustees of Church Home; that the loans to the hospitals are not for a public purpose and are otherwise in violation of the Maryland Constitution; that the purported delegation of power to administrative officials in the Act is unconsti-

tutional because adequate standards are not provided; and that the action taken in respect of Greater Baltimore and St. Joseph's is a "refinancing" forbidden by the Act.

All the parties adopted the Findings of Fact Nos. 1 through 14, made by the court below. The substance of the first four findings has been given above. Findings 5 through 14 are as follows:

"5. Greater Baltimore is a voluntary, nonprofit hospital. It is the result of a joint undertaking by the former Presbyterian and Women's Hospitals, each of which had formerly conducted specialized operations, in an effort to combine their specialties and create a new general hospital. Greater Baltimore itself is a separate eleemosynary corporation, whose members originally consisted of the members of the Board of Directors of Women's and the Board of Governors of Presbyterian. The corporation is governed by a Board of Trustees of thirteen members of which, according to the Charter, one-third are to be selected from persons nominated by the members who are directors of Women's, one-third are to be selected from persons nominated by members who are governors of Presbyterian, and one-third are to be selected from the public at large. All of the Trustees selected from nominees of the directors of Presbyterian Hospital have a Presbyterian religious affiliation.

"6. Greater Baltimore has a completely nonsectarian policy with regard both to the admission and treatment of patients and to the hiring of all personnel. The patient admission form provides a space in which religious affiliation may be indicated, as does the chaplaincy service form which is filled out upon the patient's admission, but such designation is without significance to the hospital. Greater Baltimore has designated a portion of its facilities, comprising 68 of its 400 beds, as the 'Presbyterian Hospital Section'. This section consists of the departments of otolaryngology and ophthalmology, the specialties formerly conducted by Presbyterian, but the name 'Presbyterian'

has no other significance in connection with such section.

"7. The agreement between Presbyterian and Women's under which Greater Baltimore came into being, was executed September 15, 1960. Greater Baltimore itself was incorporated on October 7, 1960. The contract for general construction of the new facilities was let on July 7, 1964, and said construction was substantially completed by September 15, 1965, at which time Greater Baltimore took possession of the premises and commenced operations therein. Pending final action on its application by the Maryland Hospital Commission and the Board of Public Works, Greater Baltimore has borrowed $7,500,000 from five banks on a demand note basis.

"8. St. Joseph's is a voluntary, nonprofit hospital owned and operated by the Sisters of the Third Order, etc., a Catholic monastic order. It is incorporated as an eleemosynary corporation under the laws of Maryland. It is governed by a Board of Trustees of five members, all of whom are members of the Order. There is also an Inter-Denominational Advisory Board of 26 members, nineteen of whom at the present time are Catholic.

"9. St. Joseph's has a completely nonsectarian policy with regard both to the admission and treatment of patients and to the hiring of all personnel. The patient admission form contains a space for religious affiliation, but such designation is for informational purposes only and is without significance here. It is made available to ministers of all faiths, for patient visitation and spiritual consultation.

"10. The contract for the construction of the new St. Joseph's facilities was awarded on April 4, 1964. The facilities were substantially completed by November 28, 1965, at which time St. Joseph's took possession of them and commenced operations therein. Pending final action on its application by the Commission and the Board of Public Works, St. Joseph's borrowed

$6,500,000 from two banks on a note originally due March 31, 1966, but which has been extended to December 31, 1966. Of this amount, $4,000,000 was guaranteed by the Roman Catholic Archbishop of Baltimore. The Sisters of the Third Order have offered to lend St. Joseph's $1,000,000, which would have to be repaid over a period of time and at a rate of interest not determined. This money would be taken from the building funds of other hospitals operated by the Order. If the loan is made, then the loan applied for from the State could be reduced by $1,000,000.

"11. Church Home is a voluntary, nonprofit hospital. It was incorporated by lay members and clergy of the Protestant Episcopal Church and is governed by a Board of Trustees of 33 members, of whom 10 are clergymen of the Episcopal Church and 19 are lay members thereof. All but one of the 13 members of the Executive Committee are members of the Episcopal Church.

"12. Church Home has a completely nonsectarian policy with regard both to the admission and treatment of patients and to the hiring of all personnel. The patient admission form contains a space for religious affiliation, but such designation has no significance to the hospital.

"13. Greater Baltimore, St. Joseph's, and Church Home each has a chapel in or connected to their hospital buildings. The chapel at Greater Baltimore is nondenominational and, although it is presided over by Bishop Richard H. Baker, a retired Episcopal bishop, on a voluntary basis, it is open to all clergy and patients who care to attend or make use of it. The chapel seats 36 persons and cost about $25,000 to construct. The chapel at St. Joseph's is limited to Roman Catholic services, although anyone may attend such services. A Catholic chaplain is employed by the hospital to conduct services and to minister to such of the employees and patients who seek his services. The chapel seats approximately 200 persons and cost ap-

proximately $301,000 to build. The chapel at Church Home has been in existence for many years and, as the loan proceeds would be limited to a surgical suite, none of them would benefit the chapel in any way. It seats 108 persons and being nondenominational, is open to all persons. An Episcopal minister is employed to conduct daily services and to minister to such of the employees and patients who seek his services.

"14. There is no attempt made in Greater Baltimore, St. Joseph's, or Church Home to promote a particular religious belief or religious belief in general among the patients, or to influence their religious beliefs in any manner."

Other facts established by the record will be referred to hereafter.

I

*The Appellants' Standing to Sue*

All of the appellees except St. Joseph's concede the standing of the appellants to sue. The court below found that there was such standing, on the basis of *Murray v. Comptroller,* 241 Md. 383, 216 A. 2d 897 (1966). Since the oral argument in this case, we have decided *Horace Mann League v. Board of Public Works,* 242 Md. 645, 220 A. 2d 51 (1966), in which, on substantially similar facts on this issue, we held that taxpayers (but not the Horace Mann League) had standing to question the validity of the grants to the colleges therein involved.

In this case, the taxes of the appellants and other taxpayers similarly situated will be increased if the Act is upheld. The amount of the State bonds to be issued pursuant to the Act may eventually be repaid by the hospitals to which loans are granted, but that putative fact does not affect the taxpayers' present burden.

Under *Murray* and *Horace Mann,* the appellants' standing to sue is clear.

II

*Constitutionality of the Delegation of Power*

The appellants contend that the legislative delegation of power under the Act is unconstitutional and invalid because no ade-

quate standards are provided in respect of the selection of the hospitals to which the bonds are to be issued and the determination of the amount each hospital shall receive. Their arguments in their brief go to the adequacy of the standards set forth in the Act to guide the Commission in approving or disapproving loans requested by hospitals. However, the chief contention of the appellants is that the only power of the Commission is to process the loans and make recommendations to the Board, which has the final authority to grant any loan under the Act, and that, under the Act, the Board has unlimited discretion to approve or disapprove an application for a loan, without any standards for its guidance (except as to the relation of the amount of the loan to the cost of the proposed facilities) and that this uncontrolled discretion in the Board makes the entire Act unconstitutional and void.

In the argument before us, counsel for the appellants, while criticizing certain of the standards set forth in the Act in respect of the Commission's approval or disapproval, conceded that, if the Commission had the power to decide as to the granting of loans, the standards would be adequate.[3] We agree. "The

---

3. The standards are as follows (Code (1965 Repl. Vol.) Art. 43, Sec. 568B):

"(d) In considering applications for loan funds and prior to making recommendations upon any application for State funds under this subheading, the Commission shall consider, ascertain and determine that:

"(1) The applicant is, in fact, a voluntary nonprofit hospital corporation, chartered as such in the State of Maryland.

"(2) The said applicant or hospital has sufficient financial integrity and is in such financial condition that it can reasonably be expected to meet its obligations to the State in the repayment of the principal and interest on the said loan.

"(3) There exists in the community in which the hospital is located an ability to support the hospital in the repayment of the said loan.

"(4) There exists a need for the hospital facilities applied for in relation to the availability and planned hospitals in the State and in that particular area. In this respect, the Commission shall require in writing from the State Department of Health a statement of its judgment

modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases." *Pressman v. Barnes,* 209 Md. 544, 555, 121 A. 2d 816 (1956). "In the field of public health, still more flexible standards are permitted. The concept of public health is more definite than that of general welfare, and there is a practical necessity for expert interpretation in its application to concrete situations." *Givner v. Commissioner of Health,* 207 Md. 184, 191, 113 A. 2d 899 (1955) and cases therein cited. See also Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1, 3-8 (1964). We find the standards set forth in the Act to guide the Commission's discretion in approving or disapproving a loan sufficiently definite.

The contention that the Act is invalid because it gives uncontrolled discretion to the Board has a deeper thrust. The answer of the appellees is that Article XII, Section 1 of the Maryland Constitution creates the Board and provides that it shall hear and determine such matters "as the General Assembly may con-

with respect to the need. Said judgment, however, shall not be binding upon the Commission but shall be considered in the ultimate determination of need.

"(5) That the said hospital or applicant cannot reasonably obtain from other sources that portion of the cost of its proposed program of construction, expansion, relocation, replacement or modernization of its buildings, facilities and equipment which it seeks to finance through the use of State funds at comparable rates and comparable terms and conditions. In the application of this paragraph endowment funds and other loan funds shall not be considered as other sources for financial aid.

"(6) That the hospital can secure the paramedical assistance its proposed program will require.

"(7) That the hospital's managerial, administrative and medical staffs conform or will conform to acceptable standards of professional integrity and ability.

"(8) That hospital facilities obtained and constructed under the provision of this subheading, will meet State Department of Health rules and regulations for licensing and must give assurances to the Commission of its ability to provide general hospital services."

fer upon them the power to decide," and that pursuant to this provision Code (1965 Repl. Vol.) Art. 78A, Sec. 1 grants to the Board "such powers and duties as may be delegated to it from time to time in regard to the creation of State debt * * *". The delegation to the Board under the Act, the appellees contend, is within the confines of the Constitutional provision, as effectuated by Article 78A. The question, however, in our opinion, involves other legal issues.

Article 78A imposes a number of specific restrictions, not here pertinent, upon the authority of the Board when acting in an executive capacity. But the final authority entrusted to the Board under the Act is administrative in nature. The choice among applications for loans and the fixing of the sums to be awarded the hospitals whose applications are approved, within the statutory limitations, are determinations characteristic of the functions of administrative agencies. See *Hyson v. Montgomery County*, 242 Md. 55, 217 A. 2d 578 (1966) and authorities therein cited.

That one member of the Board is the Governor of the State and another the Comptroller, both elected by the people, does not exclude the Board, in such functions as are here involved, from the operation of the legal principles applicable to administrative agencies. The title of the governmental officers cannot obscure the real nature of the governmental function they are performing. The Supreme Court has held that the principles of administrative law are to be applied to actions administrative in nature, even though the carrying out of the particular function has been delegated by Congress to the President of the United States. *Panama Refining Co. v. Ryan*, 293 U. S. 388 (1935). The same principle has been applied by this Court to lower governmental echelons. *Hyson, supra; County Comm'rs v. Northwest Cemetery Co.*, 160 Md. 653, 154 Atl. 452 (1931); *Farmers & Planters Co. v. Mayor & Council of Salisbury*, 136 Md. 617, 111, Atl. 112 (1920); *Mayor & City Council of Baltimore v. Radecke*, 49 Md. 217 (1878).

The failure to provide any standards for the exercise of administrative discretion has been held to render the delegation of authority to the agency invalid. *Maryland Theatrical Corp. v. Brennan*, 180 Md. 377, 24 A. 2d 911 (1942); *Northwest*

*Cemetery Co., supra.* However, the statutory criterion of "public interest, convenience or necessity" has been held not too indefinite. *New York Central Securities Corp. v. United States,* 287 U. S. 12 (1932) and *Federal Communications Comm'n v. RCA Communications, Inc.,* 346 U. S. 86, 90 (1953). See also *Fahey v. Mallonee,* 332 U. S. 245 (1947), *Pressman v. Barnes, supra* and *Cohen, supra; but see* Friendly, *Federal Administrative Agencies: The Need for Better Definitions of Standards,* 75 Harv. L. Rev. 863, 1055, 1263 (1962).

Viewed within the framework of these principles, a serious constitutional question might arise if the delegation of power to the Board under Article 78A, Section 1 were to be construed as authorizing the General Assembly to delegate power to the Board when it is to act as an administrative agency without the imposition of any standards to canalize its discretion. Further, an unrestricted authorization to the Board to select the hospitals to which loans are to be granted might well have a vital bearing upon the question under the establishment clause of the First Amendment, to be hereinafter considered, of whether the Act constitutes valid State action to promote the general welfare of its citizens, even though religious interests may be indirectly benefited. We do not reach the question of the effect of the delegation, if it were unconstitutional, for we find implicit in the Act adequate guides for the exercise of the Board's discretion.

The history of a legislative enactment often sheds light upon its intent and may be of aid in construing its terms. *Pressman v. Barnes, supra,* 209 Md. at 558-59. In 1962, the General Assembly passed Joint Resolution No. 22 requesting the Committee on Medical Care of the State Planning Commission to study and make recommendations concerning the creation of a Statewide authority to be concerned with the planning and financing of the construction of hospital facilities. The preamble to the resolution recites, *inter alia,* that:

> "the health and economic well being of communities is dependent on hospitals which serve as general resources, * * *
>
>     * * *
>
> "the absence of adequate hospital facilities to support

community medical care is detrimental to the development of the community; * * *

* * *

"these health care needs should be met with a State-wide plan assuring equal concern for all communities and not by special consideration; * * *" Laws of Md., 1962 Joint Resolution No. 22 (H.J.R. 25).

The report of the Medical Care Committee is dated January 31, 1963 and was filed with the Chairman of the State Planning Commission on February 15, 1963. This report adopted and emphasized the principles set forth in the preamble to the Joint Resolution and stated: "that expansion of the voluntary nonprofit system into all areas and locations appropriate to it, and consistent with coordinated planning on a Statewide basis, is desirable in the public interest, both health-wise and from a viewpoint of economy in State fiscal management."

The Act was passed in the session following the Committee's report. The terms of the Act indicate the realization expressed in the 1962 Joint Resolution and in the report of the Medical Care Committee that the State's primary purpose in providing for loans to voluntary nonprofit hospitals is the expansion of hospital facilities in the State for the welfare of its citizens.

It is true that subsection (a) of Section 568B of the Act provides that any approval or disapproval or recommendation of the Commission are only for the consideration of the Board and are not binding upon it and that subsection (c) provides that final authority for the granting of any State loan funds to any applicant is vested in the Board. However, subsection (b) provides that in the performance of its duties, the Commission shall study the plans and needs concerning the adequacy of hospital facilities throughout the State. The implication seems inevitable that in giving final authority to the Board in the following subsection the Legislature intended that in exercising its discretion as to the granting or refusal of a loan, the Board, like the Commission, should be guided by the same broad criteria for the public welfare. This implication is emphasized by Section 568G, which, for all the purposes of the Act, defines a voluntary nonprofit hospital as one operated for general medical and surgical treatment available to the general public.

That the standards spelt out for the guidance of the Commission were not made applicable to the Board does not mean that the Board's discretion was intended to be absolute. The approval of a master plan by a planning commission is a guide to County Commissions sitting as a regional zoning council but is not binding upon them; nevertheless, the action of the Commissioners cannot be arbitrary, unreasonable or capricious. *Bd. of County Comm'rs v. Edmonds,* 240 Md. 680, 215 A. 2d 209 (1965).

That, in the delegation of authority to the Board, there is no express statutory provision that its decisions cannot be arbitrary or unreasonable is immaterial. Such a limitation is implied as a necessary condition of the validity of the delegation.[4] This Court has consistently exercised its inherent power to review actions of administrative agencies alleged to be arbitrary or capricious even if there is no express statutory authority for such review. *State Dep't of Health v. Walker,* 238 Md. 512, 522-23, 209 A. 2d 555 (1965); *England v. Mayor & Council of Rockville,* 230 Md. 43, 45, 185 A. 2d 378 (1962); *Hecht v. Crook,* 184 Md. 271, 277-81, 40 A. 2d 673 (1945).[5]

We find that there are implied limitations upon the exercise of the Board's authority under the Act that its decisions should be made in consideration of the adequacy of hospital facilities throughout the State, that the recommendations of the Commission, while not binding upon the Board, are to be taken as a guide to it in its determinations, and that its decisions are

---

4. Two opinions of Chief Judge Alvey, rendered while sitting in the Circuit Court for Washington County, were published as an appendix to the Court's decision in State v. Brown, 73 Md. 484 (1891). In one of these opinions, the Chief Judge said (although in a situation where the statutory provisions were more explicit): "It was manifestly the design of the authors of the Constitution to withhold from the Board of Public Works an uncontrolled discretion in the sale of the State's interest in the canal company * * *" 73 Md. at 604.

5. In Terminal Constr. Corp. v. Board of Public Works, Circuit Court of Baltimore City, July 22, 1957 (Daily Record, July 29, 1957), in a suit for a declaratory judgment, Judge Harlan reviewed the action of the Board in awarding a contract, to determine if the Board's action was arbitrary. He held it was not. There was no appeal. There was no statutory provision for court review.

not to be arbitrary or capricious but to be made in the public interest. So limited, we hold the delegation of authority under the Act to be valid and consistent with an interpretation of the Act as State action to promote the general welfare of its citizens.

### III

#### *"Refinancing"*

Section 568B of the Act (Article 43) contains the following sentences:

> "The Maryland Hospital Commission shall not consider any application from any voluntary nonprofit hospital if the purpose of such application is to obtain funds for refinancing an existing loan. This shall not prohibit the submission of an application in those cases where the term of an existing loan has expired and there is a necessity for new financing for the balance."

Following the passage of the Act and the appointment of the Commission in the summer of 1964, Greater Baltimore and St. Joseph's indicated their intentions to submit formal applications to the Commission for loans to cover portions of the cost of the proposed additional hospital facilities. Both hospitals wished to proceed promptly but needed temporary borrowing to meet construction costs.

Before proceeding with the temporary financing, Greater Baltimore orally requested an opinion from the Attorney General as to whether the proposed temporary borrowing from private sources would make the hospital ineligible for a loan under the Act. The written opinion of the Attorney General on the matter, dated October 28, 1964, was addressed to the Chairman of the Commission. In that opinion, the Attorney General went into the history of the Act, and said:

> "The quotation of these recommendations [from the report of the State Planning Commission's Committee on Medical Care] indicates that the loan program which the Act contemplates is intended rapidly and broadly to strengthen the voluntary non-profit hospital system in Maryland and to encourage its capital ex-

pansion on a sound basis pursuant to identifiable need.

"An interpretation of the statutory prohibition on 'refinancing' which would exclude from participation in the program any hospital presently undertaking or about to undertake 'construction, expansion, replacement, relocation or modernization of hospital buildings, facilities and equipment' simply because that hospital has moved ahead, in the manner indicated, during the time which the Commission needs to secure and evaluate the information pertinent to its recommendatory functions would defy the plain purpose of the program and might effect a discrimination against highly deserving institutions, for the sake, at most, of semantic propriety."

Relying on this opinion, Greater Baltimore and St. Joseph's proceeded with the temporary borrowings. Greater Baltimore borrowed $6,000,000 on an unsecured demand basis in September 1964, which amount was subsequently increased to $7,500,000. St. Joseph's borrowed $6,500,000 in January 1965, on a note due March 31, 1966; the note was extended to December 31, 1966 and, since the hearing in the court below, was made payable on demand. Both hospitals used the monies obtained from their temporary financing to begin construction before their applications for loans under the Act had been approved.

The appellants contend that when Greater Baltimore and St. Joseph's applied to the Commission for loans under the Act, each application was in fact to obtain funds for an existing loan which by its terms had not then expired, that each hospital is relying on the requested State loan to pay off or refinance or refund its existing loan, and that therefore the Commission's loans to the two hospitals are invalid because forbidden by the terms of the Act. We disagree.

"Refinancing," as used in the Act, is not a word of art. There are disagreements, even among financial experts, as to the meaning of the word. See *Collector of Revenue v. Mossler Acceptance Co.*, 139 So. 2d 263, 270-73 (La. App., 1962) and *Du Quesnay v. Henderson*, 24 Cal. App. 2d 11, 14-15, 74 P. 2d 294 (1937). The complexities of modern banking, like the us-

ages of the law merchant which Lord Mansfield incorporated into the common law, require that the terms used be regarded in the context of the practices which they reflect. The language of the section of the Act here involved contrasts the prohibited purpose of refinancing an "existing" loan with the permitted new financing of the balance of an "expired" loan. A demand loan may, semantically, be regarded as existing and a construction loan agreement, which generally looks to long term financing on the completion of the construction, may be regarded as having a term, however short. However, the purpose of the Act, emphasized by its title [6] is to encourage the building of new hospital facilities. Both Greater Baltimore and St. Joseph's took the action they did in pursuance of that purpose. Had they waited to begin the construction contemplated until this case had been decided, the question raised by the appellants would not have existed, but the construction of the new facilities would have been delayed. To hold that, under the circumstances here present, the terms of the Act have been violated would be contrary to the purpose of the legislation.

As Judge Barnes said for the Court, in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 478, 209 A. 2d 582 (1965): "In construing the words used in the statute, this Court will consider them in their natural and ordinary signification; if, however, the words used in the statute are of doubtful meaning, this Court in determining the legislative intent, will consider not only their usual and literal meaning, but their meaning and effect considered in the light of the objectives and purposes of the enactment and the consequences resulting from one meaning rather than another meaning, with the real legislative intent prevailing over the intent indicated by the literal meaning of the words used. *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961)." Here, in our opinion, the words of the statute of themselves contain ambiguities which make it neces-

---

6. The title of the Act relates it to "the construction, expansion, relocation, replacement or modernization of hospital buildings, facilities and equipment" of voluntary nonprofit hospitals. The title of an act is relevant to the ascertainment of its intent and purpose. Central Credit Union v. Comptroller, 243 Md. 175, 220 A.2d 568 (1966).

sary to look to the spirit and purpose of the enactment. See *Amalgamated Cas. Ins. Co. v. Helms,* 239 Md. 529, 535-36, 212 A. 2d 311 (1965) and cases therein cited.

The two hospitals as well as the Board acted in the light of the opinion of the Attorney General on the question involved. In *State v. Cadwalader,* 227 Md. 21, 24, 174 A. 2d 786 (1961), Judge Marbury, for the Court, said: "Opinions of the attorney general, though not binding on this Court, are, of course entitled to careful consideration, and they serve as important guides to those charged with the administration of the law. They frequently constitute valuable contemporaneous constructions of statutes recently enacted."

As in *Cadwalader,* we find the opinion cited persuasive in support of the conclusion therein stated. We find the loans here involved did not violate the terms of the Act.

## IV

### *Conflict of Interests*

John A. Luetkemeyer is a member of the Board by reason of his position as State Treasurer. He is also Vice President and one of the 33 members of the Board of Trustees of Church Home, and is on various committees of that hospital's board, including its Finance Committee. The appellants contend that the Board's loan to Church Home is invalid, because as a member of the Board, Mr. Luetkemeyer voted to approve the loan to Church Home, as well as other loans involved.

Admittedly, Mr. Luetkemeyer does not derive any financial or pecuniary benefit from his activities in connection with Church Home. Like many other public-spirited men, he gives of his time and contributes his ability and experience without thought of compensation except that which enures in public service. The appellants urge, however, that, at common law, Mr. Luetkemeyer's personal interest in Church Home makes the loan to that institution (and, inferentially, the loans to the other two hospitals) voidable at the suit of any taxpayer. They contend that the provision of Code (1965 Cum. Supp.) Art. 19A, dealing with conflicts of interest, is narrower than the common law, and that the provision of Section 6(b) of that Article that the terms of the Article shall not apply to members of the

Board only pertains to transactions in which the member of a State agency has a financial interest, as contrasted with a personal interest.

Even at common law, Mr. Luetkemeyer's personal interest in Church Home would not necessarily make the Board's loan to that hospital voidable. The appellants rely upon *Montgomery County Bd. of Appeals v. Walker,* 228 Md. 574, 180 A. 2d 865 (1962), but that case is not apposite. There, a member of the Montgomery County Board sought to disqualify himself from voting on a rezoning application because he had previously resided in the community where the special exception was sought and had subsequently been legal counsel for a corporation owned by one of the applicants for the exception. The Circuit Court of Montgomery County ordered the member of the Board to vote, despite his objection to doing so, but, on appeal, this Court held the order to have been erroneous. While in his opinion for the Court, Judge Sybert referred to the board member's personal and pecuniary interest in the outcome of the decision, the personal interest there involved was that of a resident who objected to a proposed rezoning in his community—a self-interest far different in nature than that of a non-compensated board member of a nonprofit charitable institution.

Closer in point on the common law question is *Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 18-22, 204 A. 2d 795 (1964). In that case, it was held, *inter alia,* that the fact that two corporations have interlocking directors does not of itself invalidate a transaction between them. Judge Sybert, for the Court, analyzed pertinent precedents and pointed out that the essential test is the fairness of the transaction. Here, apart from the constitutional and legal questions, it is not contended that the Board's loans were in any sense unfair. It is not suggested that there was not full disclosure of Mr. Luetkemeyer's connection with Church Home. Moreover, under Article XII, Section 2 of the Maryland Constitution and Section 6 of the Act (Ch. 138, Laws of 1964), a majority of the Board is competent to act on the matters before it. There is no showing that Mr. Luetkemeyer's vote was needed to constitute a majority as to any of the loans. See Annot. *Member of Govern-*

*mental Board Voting on Measure Involving His Personal Interest*, 133 ALR 1257 (1941).

In any case, the General Assembly has determined the matter. The Conflicts of Interest Statute deals with transactions in which members, agents or employees of a State agency have a direct financial interest. By its terms, the statute does not apply to members of the Board. The State submits that under appellants' construction of Article 19A, a member of the Board does not violate the law if he participates in Board approval of a loan to a private profit-making firm owned by him, yet the law would be violated if a similar loan were made to a charitable institution with which he was connected but from which he derived no personal gain. The State contends the Legislature could not have intended such a result when it enacted the Conflicts of Interest Statute. We agree.

Moreover, Section 3 of that statute empowers the Board to approve the voting on a matter of a person who otherwise would be disqualified under the terms of the statute if "his doing so shall previously be approved by the Board of Public Works as being required in the public interest because of his special knowledge or experience in the subject matter of the transaction." This provision, like the provision of Section 6(b) of the same statute, reflects a legislative apprehension that, in view of the multitude of matters in which the State has an interest, an over-technical, unrealistic application of the sound conflict of interests principle might make it difficult for the State to find citizens of the caliber and broad interests whom it wishes to act on its behalf.

In the future, because of the sensitive area in which the Board operates under the Act, members of the Board may prefer not to participate in decisions involving institutions on whose boards they serve. We find, however, that Mr. Luetkemeyer's voting on the loans here involved, including the loan to Church Home, did not violate any legal prohibition.

## V

*Questions in respect of the Term of the Proposed
State Bonds, the "Public Purpose" thereof, and the
Lending of the State's Credit.*

The appellants contend that while the State bonds to be issued under the Act meet the fifteen year requirement of Article III, Section 34 of the Maryland Constitution, that Section of the Constitution is violated by Section 568F of the Act which authorizes the use of the State funds for loans to qualifying hospitals for a term up to 40 years. We find the contention to be without merit.

In *Lerch v. Maryland Port Authority*, 240 Md. 438, 214 A. 2d 761 (1965), we held constitutional an act authorizing the Maryland Port Authority to issue its revenue bonds to finance an international trade center. There was no provision requiring the payment of the bonds within fifteen years. One of the contentions made by the taxpayers who attacked the validity of the act was that the Authority's bonds would constitute a debt in the constitutional sense. We held that the statute did not authorize the creation of a debt by the State. While the constitutionality of the statute in *Lerch* was attacked because of the alleged use of the State's property, the historical and decisional background of the credit clause of the Maryland Constitution, discussed in *Lerch,* is applicable here. It is only the State bonds to be issued which will constitute a State debt, and these bonds are to comply with the constitutional conditions. The use of the proceeds for loans to hospitals does not make those loans State debts; the credit of the State is not involved.

*Johns Hopkins Univ. v. Williams,* 199 Md. 382, 86 A. 2d 892 (1952) and *Melvin v. Board of County Comm'rs of Anne Arundel County,* 199 Md. 402, 86 A. 2d 902 (1952), held that the State did not violate the constitutional restrictions on debt when it sold bonds and gave the proceeds in cash to Johns Hopkins University or Anne Arundel General Hospital. The appellants seek to distinguish these cases on the ground that in them the proceeds of the sale of the bonds were given to the institution, while here the monies are to be lent. The distinction, in our opinion, is unsound. The credit clause does not

compel the State to give monies to institutions to effectuate its purpose instead of getting the monies back by the repayment of loans.

*Lerch, Johns Hopkins Univ., Finan v. Mayor & City Council of Cumberland,* 154 Md. 563, 141 Atl. 269 (1928) and *Adams v. County Comm'rs of St. Mary's County,* 180 Md. 550, 26 A. 2d 377 (1946) and the cases therein cited, are dispositive of the appellants' contention that the loans to hospitals authorized by the Act are not for a public purpose, in violation of Articles 15 and 23 of the Maryland Declaration of Rights and Section 34 of Article III of the Constitution.

In *Finan,* the Court sustained a municipal bond issue of the City of Cumberland, part of the proceeds of which was to be advanced to the Allegany Hospital of Sisters of Charity. The advance apparently was a gift, conditioned only on the continued operation of the hospital. In answering the contention that the advance to the hospital was not for a public purpose, Chief Judge Bond, for the Court, said, at 565, 567 :

> "The Allegany Hospitals of Sisters of Charity is undoubtedly a private corporation, for it was regularly organized as such, elects its own managers and is in no way subject to public authority or control. *University of Maryland v. Williams, supra; St. Mary's Industrial School v. Brown,* 45 Md. 310, 329. Its work is in large part charitable, but it also takes pay patients, as all economically conducted hospitals do. The trial court came to the conclusion, after an exhaustive consideration of the questions raised, that the appropriation to it was valid; and this court has come to the same conclusion.

> \* \* \*

> "Long before, [*St. Mary's Industrial School v. Brown*] it had been decided that public funds might under proper legislative authority be appropriated to aid private agencies performing services to the community which were public in nature. *University of Maryland v. Williams, supra; St. John's College v. State,* 15 Md. 330. And from the beginning of the state govern-

ment it had been the policy and practice to accomplish public purposes indirectly by such means; and all constitutions promulgated since the beginning had been framed unquestionably in full knowledge of this policy and practice, and in none was anything inserted or changed to interfere."

The appellants contend that the Maryland cases involving sectarian institutions have been overruled by recent decisions of the Supreme Court of the United States construing the establishment of religion clause of the First Amendment. We shall discuss the constitutionality of the Act under these decisions in a subsequent portion of this opinion.

## VI

### *Articles 23 and 36 of the Maryland Declaration of Rights*

In *Horace Mann,* decided after the argument in this case, the Court held that the appropriation of public money to schools controlled by religious organizations did not contravene any Article of the Maryland Declaration of Rights. In this holding, the Court was unanimous. The discussion of Chief Judge Prescott, for the Court, of the questions under the grants to the schools involved in *Horace Mann* is fully applicable to and dispositive of the questions here raised by the appellants under the Maryland Declaration of Rights in respect of the loans under the Act to hospitals which may be owned or controlled by religious institutions.

## VII

### *The Establishment of Religion Clause*

In *Murray, supra,* 241 Md. at 398, the Court set forth the guide lines which we found in the decisions of the Supreme Court in respect of the establishment clause of the First Amendment, now beyond question made applicable to the States through the Fourteenth. In *Horace Mann, supra,* those general principles were repeated; the dissent went only to their application on the particular facts. They are as follows:

"We are a religious people and recognize the effect religious institutions have on human activity. The

First Amendment was designed to erect 'a wall of separation between church and State.' Mutual independence, under our Constitution, is deemed best for the State and best for religion. The State cannot forbid nor can it perform or aid in performing the religious function. Like other broad constitutional concepts, the meaning of 'separation' is to be ascertained in the application of the principle to specific cases. A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious considerations, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the Amendment, but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion."

In this case, we find that while under the Act religious interests may be indirectly benefited, the State action is taken to promote the general welfare of society, apart from any religious considerations; that the promotion of religion is not a primary purpose or effect; and that the State could not reasonably have attained the secular end by means which would not indirectly aid religious interests.

The proposed loans to the three hospitals under the Act will be for long terms at comparatively low rates of interest, and admittedly will make the cost of the new facilities substantially less than if a comparable portion of the cost were financed through private lending institutions, if such financing in the proposed amounts were feasible. St. Joseph's is owned and operated by an Order of the Roman Catholic Church. That Order has made available to the hospital $1,000,000 or more for its proposed enlargement, in addition to the funds requested for a loan under the Act. If the loan were not granted, the presumption seems irrebuttable that the Order would be called upon for more of its funds. The loan will release the resources of the Order for use in its religious purposes. Whether Church

Home and Greater Baltimore are church-oriented is disputed, but the degree, if any, in which either of these hospitals is church-affiliated is less than in the case of St. Joseph's. We do not reach the questions involved in a consideration of the structure and antecedents of Church Home and Greater Baltimore for, in our opinion, the indirect aid to the Mother Order in the case of the loan to St. Joseph's is evident, and we consider the constitutionality of the Act under the establishment clause on the basis of that finding.

The appellants do not dispute that, insofar as the State's interest under the Act is to aid the public health and welfare, that intent is a legitimate secular purpose. In the words of Mr. Chief Justice Warren, in *McGowan v. Maryland*, 366 U. S. 420, 444 (1961); "Throughout this century and longer, both the federal and state governments have oriented their activities very largely toward improvement of the health, safety, recreation and general well-being of our citizens."

The purpose of the General Assembly to aid the health and general well-being of Maryland citizens through the operation of the Act is shown in the discussion of the Act's history in Part II of this opinion. The provisions of the Act, in the light of that history, show the legislative intent to provide a general plan for the extension and improvement of hospital facilities; in that plan, qualified sectarian hospitals are eligible for loans, not because they are sectarian, but because they are, or will be, parts of the State's hospital resources. Paradoxically, the 1966 amendment, in its temporary separation, until this case is decided, of the $50,000,000 fund into two equal parts —one for secular and one for church-affiliated hospitals—emphasizes the legislative intent that, as soon as possible, the loans shall be made only on the basis of what is best for the health and welfare of Maryland's citizens. The appellants contend, however, that the Act violates the establishment clause because one effect of the loans here involved is to promote religion and because the State's purpose could reasonably be attained without State loans to sectarian hospitals.

The questions of whether the Act had as one of its purposes or primary effects the aid to or promotion of religion and whether the public health of Maryland citizens could reasonably

have been attained without provision for loans such as are here involved are to be approached in the perspective of the development of the sectarian hospitals and their present role. From the earliest recorded times, the care of the sick was undertaken by the religious organizations. The temples of Saturn, some 4000 years B.C., were medical schools in their earliest form; in Egypt and Greece the custom of laying the sick in the precincts of the temples was a national practice. Harun al-Rashid, Caliph of Baghdad, (763-809 A.D.) attached a hospital to every mosque. Christian religious orders founded and maintained hospitals from the time of Constantine. The crusaders, in their route, established church and hospital foundations. 13 *Encyc. Britannica*, 791-92 (11th ed. 1910, article by Sir Henry Burdett). The earliest hospitals in the colonization of the United States were founded under church auspices. Commission on Hospital Care, *Hospital Care in the United States* (1947), 43-44.

In 1956, church-affiliated hospitals in the United States accounted for more than one out of every six hospitals and admitted over one-fourth of all hospital patients. Hamilton, *Patterns of Hospital Ownership and Control*, 90 (1961). These figures include Roman Catholic and Protestant hospitals, but exclude Jewish hospitals.[7] In that year, approximately one-half of the nation's hospitals, including the church-affiliated ones, were nongovernmental, nonprofit institutions; although they contained only about one-fourth of the total hospital beds, they admitted more than two-thirds of all hospital patients. Hamilton, *supra*, 89. The report of the Committee on Medical Care of the Maryland State Planning Commission states that in 1961 three-quarters of the hospital beds in the general and certain special-purpose hospitals in Maryland were operated by voluntary nonprofit hospitals (the report does not distinguish be-

---

7. "Jewish-sponsored hospitals in the United States are similar, in at least one respect, to hospitals operated under Protestant and Catholic auspices—they are sectarian hospitals with a nonsectarian intake or admission policy. However, they differ from Catholic and Protestant hospitals in that they are not owned or operated by or related to any religious institutions. They are the product of the Jewish community rather than of one or several Jewish temples or synagogues." Hamilton, *supra*, at 122.

tween secular and church-affiliated hospitals) and that, of the "patient days" served by all the general and the certain special-purpose hospitals in the State in that year, three-quarters were served by the voluntary nonprofit institutions. State aid to such institutions has been the policy and practice from the beginning of the State's government. See *Finan, supra,* at 567.

The constitutional propriety of the State's using secular qualified nonprofit hospitals to effectuate its policy of aiding the public health cannot be questioned. The appellants, however, contend that the church-connected hospitals should have been excluded as beneficiaries of loans. In the consideration of that question, we deem it of vital significance that admittedly each of the three hospitals here involved for some time has had a completely nonsectarian policy as to the admission and treatment of patients and the hiring of personnel, and that the remaining vestige of recording the religious affiliation or preference of patients on admission is for the convenience of the patients and their families, and is without significance to the hospitals. It is also agreed, as the record makes clear, that no attempt is made in any of the hospitals to promote a particular religious belief or religious belief in general among patients or to influence their religious beliefs in any manner.

The secular nature of the aid given to the patients in the hospitals is as apparent to us as was the secular purpose of the Sunday closing laws to the Supreme Court in *McGowan.* There the laws were clearly religious in origin, but, the Court held, had become secular in purpose, to provide a uniform day of rest for all citizens. Mr. Chief Justice Warren, for the Court, said that "the fact that this day is Sunday, a day of particular significance for the dominant Christian sects, does not bar the State from achieving its secular goals." 366 U. S. at 445. The treatment given patients by church-affiliated hospitals may not always have been as disconnected with the promotion of religion as it is today, but, on the facts before us, the use of the hospitals as a conduit for the treatment of Maryland patients is devoid of religious connotation.

In *Horace Mann,* this Court held, three judges dissenting, that as to three of the four church-related colleges there involved, their purposes and activities were predominantly sectarian in

nature, and that, consequently, the State grants to those colleges for construction of buildings had the operative effect of aiding religion and therefore were unconstitutional under the establishment clause. Here, the purposes and activities of the three hospitals are secular in nature.

The appellants contend that the operative effect of the loans is to aid religion because each of the hospitals maintains on its premises a chapel for religious worship. The chapels of St. Joseph's and Greater Baltimore were built as part of their new hospitals. Church Home's chapel was built in 1958, before it applied for a loan, and is not included in the cost of its contemplated improvements. The Greater Baltimore chapel cost about $25,000, or about .2% of the total cost of construction. The cost of the St. Joseph's chapel was about $300,000 or 2.36% of the total cost. All three chapels have the usual church appearance and furnishings, and religious services of varying frequency are conducted by regular chaplains for such of the patients and employees who care to attend.

The appellants argue that the existence and maintenance of these chapels shows that the State loans will support religious activities and institutions. We disagree, for the evidence, in our opinion, conclusively shows that the chapels are maintained, to a large extent, because of their therapeutic value in the treatment of some of the patients.

David Everhart, called by the appellees, is Administrator and Vice-President Administrator of the Johns Hopkins Hospital, a non-sectarian institution. Before coming to Hopkins, he was Associate Director of the Henry Ford Hospital in Detroit, and has been engaged in hospital administration in various capacities since 1950. He testified that:

> "[A]s an administrator I would consider the provisions for facilities to support religious needs of patients in hospitals as essential as the provisions of other basic patient care services such as nursing or pharmacy or central supply or other basic services. Recognition of this need has been made by the American Hospital Association, which body in about 1960 published a suggested framework of organization of chaplaincy services in hospitals and I think it has been

"ultimately recognized by the medical profession and by the AMA that there is a direct relationship between spiritual health and physical health."

He testified, further, that the Johns Hopkins Hospital maintains a full-time chaplain, as do the Baltimore City Hospitals.

In view of this uncontradicted testimony, we find nothing in the Act which makes its purpose or effect to support religion. It may be that, without the State loan, the chapels of the hospitals would have been erected by donations from religious groups or individuals who are members of such groups and that therefore these monies, by reason of the State loans, are freed for other religious purposes, but this possible effect of an indirect aid to religion, in view of the primary therapeutic effect of the chapels, is even more remote than the indirect aid to the Mother Order of St. Joseph's. In *Murray,* we held that the exemption from taxation of structures used exclusively for public worship did not contravene the prohibition of the establishment clause, because the exemption was part of a general plan for the public welfare primarily secular in nature, and because the secular purposes could not be reasonably achieved without an incidental benefit to religious organizations. In *Horace Mann,* the Court held, unanimously, that as to Hood College the primary purpose of the State grant was not to aid or support religion, even though there may have been some requirements for student attendance at chapel, because we found, on the totality of the evidence, that Hood was not religiously oriented.

In *Everson v. Board of Education,* 330 U. S. 1, 17 (1947), the Supreme Court held, in a 5 to 4 decision, that state action in reimbursing parents for the cost of the bus transportation of their children to and from parochial schools did not violate the First Amendment, because the purpose of the legislation was only to provide for the safe transportation of school children irrespective of their religious faith. Mr. Justice Black, in the majority opinion, said: "It is undoubtedly true that children are helped to get to church schools." In this case, the end to be served by the hospitals, the treatment of patients, is secular, and the availability of chapels, as one of the means to that end, is secular in its effect. Here, in our opinion, far more clearly than in *Everson,* the purpose and primary effect of the

legislation are for the public welfare and not to promote or aid religion.

In reaching this decision, we do not rely on *Bradfield v. Roberts,* 175 U. S. 291 (1899) or *Speer v. Colbert,* 200 U. S. 130 (1906) which followed it. It is true that *Bradfield* involved the validity of an agreement by the Commissioners of the District of Columbia with an incorporated hospital owned and operated by a Roman Catholic order, under which the Commissioners agreed to erect a building for the treatment of minor contagious diseases on the hospital's land, and that Congress appropriated money for the purpose. The action attacked was that of the federal Government, and the First Amendment was invoked by the taxpayer who disputed the constitutionality of the payment. The case was decided on the demurrer to the bill; the Court held that the allegations of the bill did not render the corporation a religious or sectarian body and affirmed the decree dismissing the action. In *Horace Mann,* Chief Judge Prescott, for the Court, agreed with Mr. Justice Brennan's concurring opinion in *School Dist. of Abington Township v. Schempp,* 374 U. S. 203, 246 (1963), that *Bradfield* did not decide any constitutional issues under the First Amendment. It is of interest, however, that the charter of the hospital, referred to in the opinion, stated that its powers were to open and maintain a hospital in the city of Washington "for the care of such sick and invalid persons as may place themselves under [its] treatment and care," and that Mr. Justice Peckham, in delivering the Court's opinion, stated that there was no allegation that the work of the hospital was confined to members of the Roman Catholic Church, or that the hospital had been conducted so as to violate its charter in the smallest degree.

There are many State decisions on the question of validity of State grants to sectarian hospitals but almost all of these decisions deal with particular constitutional and statutory provisions which vary from state to state and which are not here relevant (see Part VI of this opinion) or do not consider the constitutionality of the grants under the First Amendment after *Everson.* For a collection of many of these cases see Antieau, Carroll, & Burke, *Religion Under the State Constitu-*

*tions,* 10-14 (1965). There are, however, two decisions of other state courts, cited by Judge Harris in his opinion below, which we deem particularly relevant to the issue here discussed.

In *Lien v. City of Ketchikan,* Alaska, 383 P. 2d 721, 724 (1963), the city had leased a hospital constructed with state, federal and local funds to a religious order for a term of 10 years at $1 a year. The Alaska Constitution, in the words of the federal First Amendment, provides that: "No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof." The Supreme Court of Alaska sustained the validity of the lease against an attack based, *inter alia,* on the contention that the effect of the lease was a violation of the freedom of religion clause of the State Constitution. The Court said:

> "The hospital was constructed and the lease made in order to provide for the care of the sick, without regard to race, color or creed, and thus accomplish a valid public purpose. There is nothing in this arrangement from which it can be inferred that a tax-established, public institution is to be utilized to aid a religious group to spread its faith or to interfere with the religious beliefs of others. The city's action was not designed, nor does it have the effect by its nature, of promoting or giving a preferred position to whatever religious beliefs the individual members of the corporation might have. The fact that specific sectarian beliefs may be entertained by those persons does not bar the city from achieving its valid secular goal of caring for the sick."

In *Abernathy v. City of Irving,* Kentucky, 355 S. W. 2d 159 (1962), the factual situation was the same as in *Lien.* As in *Lien,* one of the grounds of attack was that the $1 a year lease of the hospital gave public property to a religious organization in violation of the First and Fourteenth Amendments to the federal Constitution. The Kentucky Court of Appeals denied the contention on the basis of its decision in *Kentucky Bldg. Comm'n v. Effron,* 310 Ky. 355, 359, 220 S. W. 2d 836 (1949). In *Effron,* the Court had held that use of state funds

for construction of certain non-profit hospitals, including a hospital owned and operated by a religious organization, did not violate the freedom of religion clause of the State Constitution, which the court said closely followed, and had been drafted with the same purpose as the First Amendment to the federal Constitution. The Court said in *Effron*:

"Manifestly, the drafters of our Constitution did not intend to go so far as to prevent a public benefit, like a hospital in which the followers of all faiths and creeds are admitted, from receiving State aid merely because it was originally founded by a certain denomination whose members now serve on its board of trustees."

The Supreme Court denied certiorari in *Abernathy,* 371 U. S. 831 (1962).

The appellants contend that the concededly legitimate purpose of the State of aiding public health and the general welfare can reasonably be attained without State loans to sectarian hospitals, so that any indirect aid to religious interests can be avoided. They rely upon testimony of John B. Rich, Chairman of the Commission, that there is no legal requirement that all hospital proposals for construction be submitted to the Commission under the Act, and that, if the Commission knew what those plans were, it could develop a plan which would not include church-affiliated hospitals. Chairman Rich testified there are 18 hospitals in the Baltimore area; he said that 10 are not church-affiliated and that these 10 contain almost half of the beds available in the area. The appellants point to the fact that prior to December 31, 1964, 11 of the 18 applicants for loans under the Act definitely were not church-affiliated as showing that loans to the affiliated hospitals are unnecessary, and stress the enactment of the 1966 amendment as evidencing the legislative realization of this conclusion.

There are several answers to the appellants' contention. While Commissioner Rich testified that it would be possible to develop a plan for loans to non-affiliated hospitals only, the record as a whole shows that such a plan would be uncoordinated and duplicative, and would delay critically needed facilities, in

addition to entailing greater over-all expense. We agree with the appellants that the protection of constitutional rights by the State cannot be made to depend upon the cost of maintaining them, but, entirely apart from fiscal considerations, the evidence convinces us that the State could not reasonably have attained its secular end of aiding the health of its citizens if the Act had confined the contemplated loans to secular institutions. The inherent inefficiency of such an alternate plan is shown by the important place which church-affiliated hospitals play, geographically and proportionately, in the State hospital structure; it is the total hospital facilities of the State which determines need. The need for expansion of the over-all facilities is evident and immediate. The 1966 amendment, to our minds, instead of evincing the feasibility of eliminating church-affiliated hospitals from the general plan, emphasized the legislative realization of the urgency of putting so much of the plan as was not contested into effect immediately. The amendment was enacted as an emergency measure, necessary for the public health and safety, and the comprehensive, non-discriminatory aspect of the plan is to be restored if and when the Court upholds the constitutionality of the Act.

There is another reason, in our opinion, why the State could not reasonably have attained its secular end if it had eliminated loans to church-affiliated hospitals. Many persons, in times of illness, instinctively wish to go to institutions in some way connected with their church or religious community. If neither the primary purpose nor effect of the State action is to aid a constitutionally prohibited result, the State, in forming a general plan for the assistance of hospitals, has the right to take into account the mores of our pluralistic society. "That Amendment [the First] requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." *Everson*, 330 U. S. at 18.

Finally, if the Act prohibited loans to church-affiliated hospitals, serious constitutional questions would arise. These questions would involve both unconstitutional discrimination, *Murray*, 241 Md. at 401-02 and cases therein cited, and infringement upon the free exercise of religion. See *Follett v. Town of*

*McCormick,* 321 U. S. 573 (1944) ; *Murdock v. Pennsylvania,* 319 U. S. 105 (1943) and *Sherbert v. Verner,* 374 U. S. 398 (1963). The Act, we have found, is designed to make loans available to qualified hospitals serving the general public under a Statewide plan, assuring, in the words of the 1962 Joint Resolution, "equal concern for all communities and not by special consideration." The plan, under the Act, makes available $50,000,000 of State money for loans to qualified voluntary non-profit hospitals on a non-discriminatory basis, geared to the health needs of the State. We have held that the primary effect of the Act and its application in this case are secular in nature. We do not reach the constitutional questions which would have to be decided if the Act forbad loans to church-affiliated hospitals; we hold only that the Legislature, in endeavoring to attain its secular end, acted reasonably in not creating the constitutional problems to which the exclusion of loans to church-affiliated hospitals would have given rise.

> *Decree affirmed; costs to be paid by appellants.*

BARNES, J., filed the following opinion, concurring in the result.

I concur most heartily in the result in this case and, indeed, with most of the reasoning in the Court's opinion. Where I differ with the opinion of the Court is (1) in regard to the applicability to the States of the provisions of the First Amendment to the Constitution of the United States in regard to the establishment of religion through the Fourteenth Amendment, and (2) the assumption that the recent decision of the Court in *The Horace Mann League v. Board of Public Works,* 242 Md. 645, 220 A. 2d 51 (1966) was a proper one.

## (1)

I recognize—as I must—that the Supreme Court of the United States since its decision in *Cantwell v. Connecticut,* 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940) has held that the provisions of the First Amendment that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof * * *" in some mysterious, but

really unexplained, way has become a limitation upon the States through the due process clause of the Fourteenth Amendment. In my opinion this was an improper decision and an unwarranted extension of federal judicial power. I have set out several of the reasons for my opinion in this regard in my dissenting opinion in the case of *State v. Barger,* decided April 20, 1966, 242 Md. 616, particularly at pages 639 to 641, and it is not necessary to repeat those reasons here. I might add, however, that in many of the decisions in construing the First Amendment in regard to the establishment of religion the majority of the Supreme Court has, in my opinion, demonstrated a lack of understanding of its meaning and of the historical background from which it came. As a consequence, it has also, in my opinion, misapplied the "establishment clause" as well as the "free exercise" clause in many of its recent decisions, assuming for the argument that federal judicial power were properly exercised at all. The extremes to which the Supreme Court has gone in applying the so-called "wall of separation between church and State" in *Engel v. Vitale,* 370 U. S. 421, 81 S. Ct. 1261, 8 L. Ed. 2d 601 (1962) and in *Abington School District v. Schempp,* 374 U. S. 203, 183 S. Ct. 1560, 10 L. Ed. 2d 844 (1963) ironically go far toward the "establishment" of materialism and non-theism or atheism as the "religion" of both the federal and state governments. These extremes now apply to the operation of state public schools in every State in the Union and in many States—including Maryland—against a well-established policy to the contrary. Thus by judicial fiat the power of the several States over the operation of their own public school systems to this extent is removed from the States and has become a matter of federal judicial determination by a majority of the Supreme Court of the United States. This is a grave impairment of the federalism upon which the government of the United States is based and, in my opinion, it is the duty of the judges of the highest appellate courts of the States to point out to the Supreme Court of the United States, in every State appellate opinion where relevant, its serious error, with the hope that the Supreme Court will itself correct this error, and return to more orthodox constitutional doctrine. Failing this, if the people and their repre-

sentatives in the Congress of the United States are made fully aware of this error and its unhappy consequences, it is not too much to hope that appropriate legislative action may be taken to correct it.

(2)

I have read with care the decision of the Court in the recent case of *The Horace Mann League v. Board of Public Works, supra,* and I have grave doubts in regard to the correctness of the decision of the majority of the Court in that case. As I was disqualified from sitting in that case, it would be inappropriate for me to express my views in this case. I reserve the right, however, to express those views as and when the decision in *Horace Mann* is later relied on as controlling authority in some later case.

I agree with the Court's opinion that the case at bar is distinguishable from *Horace Mann* for the reasons set forth in the Court's opinion and hence concur in the result.